[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 416 
The appellant, Gabor Foldi, was indicted February 5, 2001, by the Houston County grand jury for first-degree rape (CC-01-295), a violation of § 13A-6-61(a)(2), Ala. Code 1975 ("engag[ing] in sexual intercourse with a member of the opposite sex who is incapable of consent by reason of being physically helpless or mentally incapacitated"), and for first-degree sodomy (CC-01-296), a violation of § 13A-6-63(a)(2) ("engag[ing] in deviate sexual intercourse with a person who is incapable of consent by reason of being physically helpless or mentally incapacitated"). After a jury trial, Foldi was convicted of first-degree rape but was acquitted of first-degree sodomy. For the rape conviction, he was sentenced, on December 3, 2001, to 99 years' imprisonment, was fined $5,000, *Page 417 
and was ordered to pay $750 to the Alabama Crime Victims Compensation Fund and to pay court costs. He appeals his conviction, raising four issues. Although he does not question the sufficiency of the evidence to support his conviction, a recitation of the facts is helpful in understanding the issues raised.
The State's evidence showed that B.A., the victim, and two of her girlfriends went to Jake's, a local Dothan nightclub, shortly before 8:00 p.m. on January 19, 2001; that, as they were leaving Jake's about 10:30 p.m. to go to Grand Central Station, another Dothan nightclub, a stranger asked B.A. where she was going, and she told him; that, around midnight, this same man approached her at Grand Central Station and told her that "his friend" would like to buy her a drink; that, after B.A. drank the drink delivered to her, she was aware of very little until she awoke in an unfamiliar apartment about 8:30 the next morning; and that she vaguely remembered, from the previous evening, hearing people in the apartment speaking in "broken English" and having "a bunch of people pulling on [her]." B.A. testified that, when she awoke the next morning, she was lying on a couch and she did not know where she was; that her clothing was in disarray and her panties, which were on the floor, were covered in blood; that her cellular telephone, purse, and keys were missing; and that she felt "light-headed" and "confused," unlike any alcohol hangover she had previously experienced. She further testified that she asked a man in the apartment, who was later identified as Foldi, to drive her in his automobile to a friend's apartment and that another man, later identified as Foldi's brother Victor, accompanied them; and that, after her friend drove her home, she went to the hospital.
The examination at the hospital disclosed that B.A.'s vagina and rectal area were red and very tender; that her cervix had an abrasion or bruise that appeared to have been caused by trauma; and that she had bruises and was generally sore over her entire body, including her hands. The medical examiner testified that the results of a "drug-rape screen" were negative; however, she explained that "rape drugs" metabolize in the bloodstream within four to six hours after ingestion and are secreted in the urine and that if the first urine voided after ingestion was not tested, which was the case here, the test results would probably be negative.
One of her friends testified that when she approached B.A. and the three men standing with her at the nightclub, at approximately 12:45 a.m., about wanting to leave, she noted that there was something wrong with B.A. She said that B.A.'s eyes were darting around and not focusing; that B.A. told her to go to B.A.'s automobile and she would immediately follow; that she took B.A.'s purse, keys, and cellular telephone and went to the car; that, after waiting an hour, she drove the car to the front door of the nightclub and went inside to look for B.A.; that, when she found her, B.A. was "out of it" and the three men who had been with her earlier were holding her up because she was unable to stand; and that the three men, who were speaking a foreign language, led B.A. outside, where they put B.A. into their vehicle and drove away.
Michael Cirulli, an investigator with the Dothan Police Department, testified that he went with B.A. to the Camelot Apartments where she identified the apartment she had been in the night before and the automobile parked nearby in which Foldi had driven her to her friend's place that morning; that, as they were watching the apartment, Foldi came out and B.A. identified him as one having been in the apartment *Page 418 
earlier that morning and as the one who had driven her to her friend's apartment; that, after observing Foldi drive away in the vehicle B.A. had identified, he had officers stop the vehicle; that he joined the officers at the vehicle; that he advised Foldi of his Miranda[1] rights and asked him if he had had a girl in his apartment the night before;[2]
that Foldi gave him permission to search his apartment; that, after they returned to Foldi's apartment, Atillah Papp, who was identified by B.A. as having been in the apartment earlier that morning, admitted them into the apartment; that he read Foldi and Papp their Miranda rights from a standard card and they agreed to talk; and that he obtained an oral consent from Foldi and Papp to search the apartment and, also, Foldi's written consent to search. Cirulli further testified that, during the search, he discovered a video camera, a videotape, used condoms, and other incriminating evidence; that Papp told him that they had videotaped the activities with B.A.; that, when he viewed the tape briefly with Foldi at the apartment, Foldi admitted that it was him in the tape having vaginal intercourse with B.A.; and that Foldi was then transported to the police station, where he was advised of his Miranda rights again, signed a waiver of those rights, and agreed to talk to Cirulli.
Cirulli testified that Foldi stated that three of his friends had gone to a nightclub while he and three others had remained at the apartment; that, when his friends returned, he was sleeping; that they had a girl with them and they woke him up, saying, "We got a party girl."; and that, although the girl was "passed out drunk" on the couch, he had vaginal intercourse with her. Cirulli further noted that Foldi specifically admitted that he did not have the girl's permission because she was "passed out"; and that, although Foldi did not explicitly state that he had had anal intercourse with B.A., he in effect admitted it.
The videotape was admitted into evidence and shown to the jury. It depicts as many as seven men, including Foldi, performing sexual acts on B.A. in each other's presence. It clearly shows Foldi having vaginal intercourse and possibly anal intercourse with her, all the while his companions are watching, masturbating, and sexually abusing B.A. It is clear from the videotape that B.A. was unaware of what was happening, that she was incapable of consenting, and that she was physically helpless.[3]
Foldi testified in his defense that he had vaginal intercourse with B.A., but not anal intercourse, and that the vaginal intercourse was consensual.
 I. II.
Foldi contends that the trial court committed reversible error in denying his pretrial motion to suppress several inculpatory statements and physical evidence seized in the search of his apartment. After a hearing on the motion, the trial court *Page 419 
entered the following order: "Motion to suppress denied as to all statements made by the Defendant and all evidence relevant thereto, except for the first statement made at the traffic stop. That would be excluded." (R. 267.)
Foldi's "first statement," which the trial court excluded, was made while he was in the custody of the officers who stopped him in his vehicle.[4] After the stop, Cirulli asked Foldi whether he had had a girl in his apartment the previous evening, and Foldi stated that he had and that he had driven her home. This incriminating statement was preceded by Cirulli's incomplete and arguably ambiguous paraphrasing ofMiranda rights. Cirulli apparently thought that because English was not Foldi's native language, Foldi would better understand a paraphrased version of the Miranda warnings. We note, however, that we do not believe that Cirulli's failure to fully comply with Miranda was an intentional or gross violation of Miranda.
 A.
Foldi first asserts that the inculpatory statements he made after his initial faultily Mirandized statement and the evidence seized in his apartment were "tainted" by the first-statement Miranda violation and that, therefore, as "fruit of the poisonous tree," his subsequent statements and the evidence should have been suppressed.
 "The exclusionary rule requires that evidence obtained directly or indirectly through government violations of the Fourth, Fifth, or Sixth Amendments may not be introduced by the prosecution at trial, at least for the purpose of providing direct proof of the defendant's guilt. When a court improperly admits evidence in violation of the exclusionary rule, reversal is required unless the error was harmless beyond a reasonable doubt."
Miles Clark, Project, Thirty-first Annual Review of Criminal Procedure,The Exclusionary Rule, 90 Geo. L.J. 1087, 1264 (2002) (footnotes omitted).
 "As an adjunct of the exclusionary rule, the `fruit of the poisonous tree' doctrine holds that the use of derivative evidence can be barred if the evidence is discovered by the exploitation of a prior police illegality, if the primary taint has not been purged by some intervening act or event."
1 John Wesley Hall, Jr., Search and Seizure § 7.1 (3d ed. 2000).
 "The roots of the doctrine requiring courts to suppress evidence as the tainted `fruit' of unlawful governmental conduct can be traced to Silverthorne Lumber Co. v. United States, 251 U.S. 385 . . . (1920). In that case, the Supreme Court extended the exclusionary rule to apply not only to evidence obtained as a result of illegal conduct, but also to other incriminating evidence derived from the primary evidence. See id. at 392 . . . (`The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.') (emphasis added). The Court recast this holding in its more enduring form, the `fruit of the poisonous tree' doctrine, in Wong Sun v. United States, 371 U.S. 471 . . . (1963). There, the Court explained that when examining the admissibility of *Page 420 
evidence obtained subsequent to illegal government conduct, courts must examine `whether, granting establishment of the primary illegality' (i.e., the `poisonous tree'), the evidence has been discovered `by exploitation of that illegality' (i.e., the `fruit' of the tree), or instead `by means sufficiently distinguishable to be purged of the primary taint.' Id. at 488 . . . (citation omitted). If evidence is found to be the `fruit of the poisonous tree' it must be suppressed. See id."
United States v. Orso, 266 F.3d 1030, 1034 n. 2 (9th Cir. 2001),cert. denied, 537 U.S. 828, 123 S.Ct. 125 (2002).
 "The exclusionary rule is not a personal constitutional right, but rather a judicially created remedy to deter government violations of the Constitution. Because the goal of deterrence will not always be advanced by excluding relevant, though illegally obtained, evidence, the Supreme Court has identified several exceptions to the exclusionary rule . . . ."
Clark, supra, 90 Geo. L.J. at 1264 (footnotes omitted).
One exception to the exclusionary rule is the "independent source" exception.
 "Independent Source Exception. Even if police engage in illegal investigatory activity, evidence will be admissible if it is discovered through a source independent of the illegality. The independent source doctrine reflects the idea that although the government ought not profit from its misconduct, it also should not be made worse off than it would have been had the misconduct not occurred."
Id. at 1274 (footnotes omitted). See, e.g., Murray v. United States,487 U.S. 533 (1988).
We find that the exclusionary rule and the "fruit of the poisonous tree" doctrine do not apply here. Foldi's incriminating statement that there had been a girl in his apartment the previous night and that he drove her home falls within the "independent source" exception. When Foldi made this statement, the police already knew that he had been in his apartment with B.A. and that he had driven her home, having obtained this information from B.A. . Therefore, those facts were obtained independently of the initial illegality, i.e., the faulty Miranda
warnings, and that illegality did not taint Foldi's subsequent statements and the evidence seized from his apartment. No evidence was obtained or discovered by the exploitation of the officer's failure to properly advise Foldi of his Miranda rights when he initially questioned Foldi. We find no merit in Foldi's argument in this regard.
 B.
Foldi further contends (1) that he was also not properly advised of hisMiranda rights before making the inculpatory statements at his apartment and at the police station, and (2) that he was incapable of voluntarily and knowingly waiving those rights and consenting to a search of his apartment because, he argues, at the time of his statements and consent to search, he did not understand the English language and the laws and culture of the United States, he was 26 years' old, and he was intimidated by the police officers.
During the suppression hearing, Cirulli testified that, when Foldi first began speaking to him in "broken English," he asked him if he understood English, and Foldi stated that he did; that, in first advising Foldi of his Miranda rights at Foldi's vehicle, Cirulli paraphrased (inaccurately) those rights in what he believed were simple terms; that, after he paraphrased each right, he asked Foldi if he understood the right, and each time Foldi *Page 421 
acknowledged that he did understand and that he would talk with Cirulli; that he then asked Foldi if the police could search his apartment, explaining that "the girl said that she was assaulted in his apartment," but that Foldi did not have to consent and that he could get in trouble if "they looked"; and that he also asked Foldi if anyone was at his apartment at that time, and he said two people were.
Cirulli further testified that, after Foldi consented to a search of his apartment, they returned to the apartment where they were admitted by Papp; that, before asking any questions or undertaking any search, he read to Foldi and Papp their Miranda rights from a standard card (which was admitted into evidence); that, after reading and then explaining each right, he inquired if they understood and they stated that they did; that he used an English-Hungarian dictionary from the apartment to make sure they understood the meaning of the word "lawyer"; that they then agreed to talk to him; and that he made them no promises and did not threaten them in any manner.
Cirulli testified that he then told Foldi and Papp that a girl claimed that she had been raped in their apartment the night before and he asked if they would consent to a search of the apartment; that he advised them that they had a right to refuse; and that they orally consented to the search, and Foldi also read and signed a written consent to search (which was admitted into evidence); that thereafter a search was conducted and evidence implicating Foldi in the crime was found, including the videotape of Foldi's sexual assault of B.A.; and that he briefly questioned Foldi and obtained incriminating statements from him before he was transported to the police station.
Cirulli further testified that, at the station, he again read Foldi hisMiranda rights, this time from an explanation-of-rights-and-waiver form, and again explained each one; that a translator also read and explained those rights to Foldi in Hungarian; and that, after Foldi subsequently signed the waiver (which was admitted into evidence) and agreed to answer questions, he gave a detailed statement to Cirulli, further implicating himself in the crime.
Our review of the trial court's ruling on the admission of Foldi's inculpatory statements begins with the principles that a confession or inculpatory statement is prima facie involuntary and inadmissible, and that, before a confession may be admitted into evidence, the State must establish voluntariness and a Miranda predicate. Houston v. State,798 So.2d 704 (Ala.Crim.App. 2000); Jackson v. State, 562 So.2d 1373
(Ala.Crim.App. 1990). Whether a waiver of Miranda rights is voluntarily, knowingly, and intelligently made depends on the facts of each case, considering the totality of the circumstances surrounding the interrogation, including the characteristics of the accused, the conditions of the interrogation, and the conduct of the law-enforcement officials conducting the interrogation. Moran v. Burbine, 475 U.S. 412
(1986); Houston v. State, 798 So.2d at 706; Click v. State, 695 So.2d 209
(Ala.Crim.App. 1996). The trial court's finding that a statement was voluntary need be supported only by a preponderance of the evidence; it is given great deference on appeal and will not be overturned unless it is palpably contrary to the weight of the evidence or is manifestly wrong. See Taylor v. State, 808 So.2d 1148 (Ala.Crim.App.), aff'd,808 So.2d 1215 (Ala. 2001); Dixon v. State, 588 So.2d 903 (Ala. 1991);Marlowe v. State, [Ms. CR-00-2146, June 28, 2002] 854 So.2d 1182
(Ala.Crim.App. 2002); Magwood v. State, *Page 422 494 So.2d 124 (Ala.Crim.App. 1985), aff'd, 494 So.2d 154 (Ala. 1986).
Our review of the trial court's ruling admitting the evidence seized from Foldi's apartment is governed by the following principles. One of the exceptions to the rule that a warrantless search is per se
unreasonable is a search conducted with the consent of the owner.Rokitski v. State, 715 So.2d 859 (Ala.Crim.App. 1997); Chevere v. State,607 So.2d 361 (Ala.Crim.App. 1992). The burden lies with the State to show that the search falls within an exception to the warrant requirement. Rokitski v. State, 715 So.2d at 861. Whether the defendant's consent to search was voluntary is a question of fact for the trial court to determine, based upon the totality of the circumstances. Id. See alsoSchneckloth v. Bustamonte, 412 U.S. 218 (1973). However, "[n]o particular factor should be given undue weight in determining the issue of voluntariness." Rokitski v. State, 715 So.2d at 861. The fact that the defendant was in police custody or that the officers made a showing of force does not, of itself, negate a finding of voluntariness. Id. at 861-62. See also United States v. Watson, 423 U.S. 411 (1976); Hollanderv. State, 418 So.2d 970 (Ala.Crim.App. 1982). However, although not dispositive of the question of voluntariness, the fact that a defendant had been advised of his Miranda rights and of his right to refuse the request to search are significant factors in determining whether the consent was voluntary. Bradley v. State, 494 So.2d at 761; 3 Wayne R. LaFave, Search and Seizure § 8.2(i) and (j), 689-90, 692 (3d ed. 1996).
Foldi's contentions that he did not understand English or the customs and laws of the United States, that he was too young to voluntarily waive any right, and that he was intimidated by the uniformed armed police officers are clearly disputed by the evidence. At the time of the waivers, Foldi was 26 years old; he is a graduate of a high school in Hungary with 2 years' training in a vocational school and 2 years' service in the Hungarian army; he had been in the Dothan area for approximately 16 months; he had been employed at a local chicken processing plant most of that time; he owned an automobile and was renting an apartment; he had studied English at "Wallace College" in Dothan where he had the reputation for being a quick learner and for helping others for whom English is not their native language learn English; and he had little or no difficulty in conversing with Cirulli in English. B.A. testified that Foldi conversed with her in English when she was asking someone to drive her home and that, when he was driving her home, he understood her directions, which she gave in English. Furthermore, while he was incarcerated, Foldi wrote a comprehensible letter to Cirulli in English (which was admitted into evidence), giving Cirulli instructions as to the disposition of his vehicle while he was incarcerated. The most damning evidence refuting Foldi's contention that he was ignorant of the English language was his own testimony that he asked B.A. in English to consent to have sexual relations with him and that he in fact understood the consent-to-search-and-waiver form. From the evidence, it is apparent that Foldi could understand English sufficiently to understand his rights and to knowingly and voluntarily waive them. See United States v. Amano,229 F.3d 801, 804-05 (9th Cir. 2000); United States v. Guay, 108 F.3d 545,549 (4th Cir. 1997).
We further note that nothing in the record supports an argument that Foldi did not comprehend the customs and culture of the United States. In fact, this *Page 423 
argument is asserted for the first time on appeal.
Finally, Foldi's testimony bearing on the question of whether he was intimidated by the officers is sharply disputed. He rests his assertion on his testimony that three police vehicles were used to stop his automobile; that he was ultimately surrounded by four uniformed, armed officers; that the officers immediately cuffed his hands behind his back; that, immediately before entering his apartment, two officers beat on the door and drew their weapons; and that an officer used Foldi's apartment key to gain entry. In contrast, Cirulli testified that Foldi was not handcuffed until he was transported to the police station after the search; that the officers entered the apartment after Foldi knocked on the door and Papp opened it and after both Foldi and Papp had agreed that the officers could enter; and that he did not tell Foldi he was under arrest until after they had arrived at the police station. Another officer testified that weapons were not drawn by any of the officers until they had entered and were searching the apartment to ascertain if anyone else was in the apartment. We find that, given their knowledge that more than one suspect could have been involved and given Foldi's admission at his automobile that two people were at his apartment, the officers' actions were more than justified for their protection while making a sweep of the apartment.
In conclusion, after considering the totality of the circumstances surrounding Foldi's statements and consent to search, we find that the weight and preponderance of the evidence supported the trial court's implicit findings that Foldi voluntarily and knowingly waived hisMiranda rights before making the inculpatory statements to the police and consenting to the search and that he made the statements and gave his consent to search knowingly and voluntarily. Although the trial court's findings were made on conflicting evidence, this court is bound by the trial court's credibility choices in a suppression hearing. Bradley v.State, 494 So.2d at 760-61. The trial court's finding of voluntariness will not be disturbed on appeal unless the appellate court is convinced that the finding is palpably contrary to the great weight of the evidence. Ex parte Jackson, [Ms. 1981723, May 10, 2002] 836 So.2d 979
(Ala. 2002) (opinion on application for rehearing and on return to remand). Based on the foregoing, we conclude that the trial court's adverse ruling on Foldi's motion to suppress was proper.
 III.
Foldi contends that he was compelled to testify because of the admission of the allegedly illegal evidence, i.e., his statements and the evidence seized from his apartment, and that he was thereby denied his constitutional right to remain silent. He argues that the admission of his allegedly wrongfully obtained statements and physical evidence from his apartment forced him to testify to explain that evidence. There is no merit in this contention. The statements and physical evidence he refers to were properly admitted, as we held in Parts I and II, supra.
 IV.
Foldi contends that his 99-year sentence was so grossly disproportionate to his offense as to constitute cruel and unusual punishment in violation of the Eighth Amendment and require reversal. He relies on the holdings in Solem v. Helm, 463 U.S. 277 (1983); Harmelinv. Michigan, 501 U.S. 957 (1991); and Wilson v. State, [Ms. CR-97-1494, August 31, 2001] 830 So.2d 765 (Ala.Crim.App. 2001). *Page 424 
This issue was not preserved for appellate review: it was not first presented to the trial court. See Jordan v. State, 574 So.2d 1024, 1025
(Ala.Crim.App. 1990). Foldi failed to object to his sentence at the sentence hearing, in a motion for a new trial, or in a motion to reconsider his sentence. See Bishop v. State, 690 So.2d 502, 510
(Ala.Crim.App. 1996).
Even if this issue had been preserved for review, it would have no merit. Foldi's sentence is not grossly disproportionate to the crime, and the cases he relies on are factually distinguishable from this case.
For the above reasons, the judgment of the trial court is affirmed.
The foregoing opinion was prepared by Retired Appellate Judge John Patterson while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Ala. Code 1975.
AFFIRMED.
McMILLAN, P.J., and COBB, SHAW, and WISE, JJ. concur.
BASCHAB, J., concurs in the result.
[1] Miranda v. Arizona, 384 U.S. 436 (1966).
[2] This evidence was presented to the trial court in the suppression hearing.
[3] Five men, including Foldi, depicted in the videotape performing various sexual acts on B.A., were ultimately identified. They are Foldi; Victor Foldi, the appellant's brother; Atillah Papp; Atillah Vasari; and Atillah Kun. The men are Hungarian nationals who were in the United States on tourist visas, which had expired. Victor Foldi and Papp were indicted for first-degree sexual abuse and pleaded guilty to that offense. Victor Foldi was sentenced to four years' imprisonment, and Papp was sentenced to five years' imprisonment. According to the Houston County Sheriff's Office, Vasari and Kun were indicted for sodomy and sexual abuse, but they returned to Hungary and have not been tried.
[4] Foldi does not question the legality of his arrest. Clearly, the police officers had probable cause to stop his automobile and place him under arrest because they had credible information that made him a prime suspect in an alleged rape.