[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 425 
The appellant, Octavious Corte Buford, was convicted of two counts of capital murder, *Page 426 
see §§ 13A-5-40(a)(2) and 13A-5-40(a)(4), Ala. Code 1975; one count of attempted murder, see §§ 13A-4-2 and 13A-6-2, Ala. Code 1975; one count of burglary in the first degree, see §13A-7-5(a)(1), Ala. Code 1975; and one count of robbery in the first degree, see § 13A-8-41(a)(1), Ala. Code 1975. Following the verdicts, the State advised the trial court that it was not seeking the death penalty for the capital-murder convictions and the trial court sentenced Buford to life imprisonment without the possibility of parole for each capital-murder conviction. Following a sentencing hearing, Buford was sentenced to life imprisonment for each of the three remaining convictions; those sentences were to run consecutively.
The evidence adduced at trial indicated that on December 29, 1999, armed with handguns and a shotgun, Buford and two accomplices, Gabriel Dona Birdsong, and Lavoris Deshawn Hampton, also known as "Crusher," forced their way into the residence of Milton and Marie Hines, in Tanner, Alabama, where Milton, Marie, and several relatives and other guests were present.[1]
According to the eyewitness testimony, Quentin Troupe, a friend of one of Milton and Marie's sons, had fallen asleep in a chair. The testimony indicated that Troupe awoke when the men came in and that, at that time, one of the intruders began firing his weapon. Troupe was shot four times and died as a result of his wounds; Bill Oscar Lee, Jr., another friend of one of Milton and Marie's sons, was shot once in the leg. The testimony indicated that the gunmen searched Troupe's pockets and asked the other individuals present in the house for their money before fleeing.
Lee testified that he recognized one of the men, who he knew as "Crusher," and said that he called out that name when he realized that the men were carrying firearms. According to Lee, Troupe, who had been asleep in a chair, woke up when the men yelled "get down" (R. 485); Lee testified that the man he recognized as "Crusher" shot and killed Troupe and then turned and shot him as well. Amber Kirby, the girlfriend of Milton and Marie's son, Travis, and Marie both testified that they heard Lee call out "`What's up, Crusher?'" (R. 463) or "`Crusher, what's up?''" (R. 469), immediately before the gunshots were fired.
Lee further testified that he recognized Buford as one of the other gunmen, even though Buford's face was covered during the incident. Lee stated that he only knew Buford as "Ta-ta"; that he recognized Buford by his body shape, height, and weight; and that he learned Buford's real name from a newspaper article following Buford's arrest.
The evidence also indicated that one of the men fired two shots into a sports utility vehicle ("SUV") parked in front of the Hines residence — further testimony indicated *Page 427 
that a pager discovered that night in the street next to the SUV belonged to Birdsong.[2] Additional testimony indicated that the men got into a Ford F-150 pickup truck and drove away. A neighbor followed the men as they fled in the pickup truck and was able to get a partial license plate number of the truck. Sylvester Jones, Jr., testified that he loaned his red Ford F-150 pickup truck to Birdsong's brother the day of the shootings; the license plate number of the truck corresponded with the partial license plate number of the getaway vehicle.
The State presented testimony that placed Buford, Hampton, and Birdsong in a red Ford pickup truck in Tanner shortly before the offenses were committed. Further, Rasheka Goode testified that Buford, Hampton, and Birdsong came to her house on the evening of December 29, 1999. According to Goode, Buford asked her for a T-shirt; she testified that Buford had what appeared to be a bloodstain on his shirt. Buford was taken into custody at his girlfriend's house approximately five to six hours after the incident and was questioned at approximately 2:30 a.m. on the morning of December 30, 1999; Hampton and Birdsong were arrested in Indiana approximately one week later.
 I.
Buford first argues that the State failed to present sufficient evidence "to support a verdict of capital murder." (Buford's brief at p. 15.) Although he couches his claim in terms of the sufficiency of the State's evidence, his argument challenges both the weight and sufficiency of the State's evidence — in addition to arguing that the State did not present any evidence establishing that he had the intent to kill, Buford challenges the credibility of the State's witnesses and alleged inconsistencies in the evidence.
"`In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.'" Ballenger v. State,720 So.2d 1033, 1034 (Ala.Crim.App. 1998), quoting Faircloth v. State,471 So.2d 485, 488 (Ala.Crim.App. 1984), aff'd, 471 So.2d 493
(Ala. 1985). "`The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App. 1997), quoting O'Neal v. State, 602 So.2d 462, 464
(Ala.Crim.App. 1992). "`When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.'"Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App. 1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App. 1990). "The role of appellate courts is not to say what the facts are. Our role . . . is to judge whether the evidence is legally
sufficient to allow submission of an issue *Page 428 
for decision [by] the jury." Ex parte Bankston, 358 So.2d 1040,1042 (Ala. 1978).
Section 13A-2-23, Ala. Code 1975, provides, in part:
 "A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
 "(1) He procures, induces or causes such other person to commit the offense; or
 "(2) He aids or abets such other person in committing the offense. . . ."
The Commentary following § 13A-2-23 states that "[e]ach person who joined [the] unlawful enterprise is responsible for the results whether committed by one or all, Carlisle v. State,36 Ala.App. 241, 58 So.2d 638 [(1951)], cert. denied, 257 Ala. 282,58 So.2d 641 (1952)."
 "`[I]n Alabama, an individual who is present with the intent to aid and abet in the commission of an offense is as guilty as the princip[al] wrongdoer.' Price v. State, 725 So.2d 1003, 1055 (Ala.Crim.App. 1997), aff'd, 725 So.2d 1063 (Ala. 1998). `The words "aid and abet" encompass all assistance by acts, words of encouragement, or support, or presence, actual or constructive, to render assistance should it become necessary.' Henry v. State, 555 So.2d 768, 769 (Ala.Crim.App. 1989). `The culpable participation of the accomplice need not be proved by positive testimony, and indeed rarely is so proved. Rather, the [the trier of fact] must examine the conduct of the parties and the testimony as to the surrounding circumstances to determine its existence.' Miller v. State, 405 So.2d 41, 46
(Ala.Crim.App. 1981) (citation omitted). `The [trier of fact] is to determine whether the appellant's participation exists and the extent of it from the conduct of the parties and all the testimony presented.' Walls v. State, 378 So.2d 1186, 1191
(Ala.Crim.App. 1979). `Such facts as the defendant's presence in connection with his companionship, his conduct at, before, and after the commission of the act, are potent circumstances from which participation may be inferred.' Sanders v. State, 423 So.2d 348, 351 (Ala.Crim.App. 1982). However,
 "`"[t]he mere fact that a person witnesses a crime does not make him an accomplice." Nelson v. State, 405 So.2d 392, 397 (Ala.Cr.App. 1980), reversed on other grounds, 405 So.2d 401 (Ala. 1981). "The mere presence of a person at the time and place of a crime is not sufficient to justify his conviction for the commission of the crime." Dolvin v. State, 391 So.2d 129, 133 (Ala.Cr.App. 1979), reversed, 391 So.2d 133 (Ala. 1980). However, "if presence at the time and place a crime is committed, in conjunction with other facts and circumstances, tends to connect the accused with the commission of the crime, then the [trier of fact] may find the accused guilty." Dolvin, 391 So.2d at 137. "[P]resence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred." 22 C.J.S. Criminal Law § 88(2)(d) (1961). Gibson v. State, 49 Ala.App. 18, 20, 268 So.2d 49 (1972).
"`. . . .
 "`Although mere presence at the time and place of a crime is not sufficient to justify a conviction for the commission of that crime, presence is a factor to be considered by the [trier of fact] in determining the guilt of the accused because "mere presence does establish a `material fact, which is the opportunity of defendant to commit the *Page 429 
offense.'" German [v. State], 429 So.2d [1138,] 1141 [(Ala.Crim.App. 1982)].
 "`To make one accused of a crime an accomplice, "the State must adduce some legal evidence implying that he either recruited, helped or counseled in preparing the [crime] or took or undertook some part in its commission. Criminal agency in another's offense is not shown merely by an exhibition of passivity." Pugh v. State, 42 Ala.App. 499, 502, 169 So.2d 27
(1964).'
 "Payne v. State, 487 So.2d 256, 261-62
(Ala.Crim.App. 1986). See also Webb v. State, 696 So.2d 295 (Ala.Crim.App. 1996)."
Harris v. State, 854 So.2d 145, 151-52 (Ala.Crim.App. 2002). "When two or more persons enter upon an unlawful purpose, with a common intent to aid and encourage each other in anything within their common design, they are each responsible, civilly and criminally, for everything which may consequently and subsequently result from such unlawful purpose, whether specifically contemplated or not." Landry v. State,56 Ala.App. 421, 423-24, 321 So.2d 759, 761 (Ala.Crim.App. 1975).
Also, "`[i]ntent, . . . being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.'" Seaton v.State, 645 So.2d 341, 343 (Ala.Crim.App. 1994), quoting McCordv. State, 501 So.2d 520, 528-29 (Ala.Crim.App. 1986). Intent "`"may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances."'" Farrior v.State, 728 So.2d 691, 695 (Ala.Crim.App. 1998), quoting Jonesv. State, 591 So.2d 569, 574 (Ala.Crim.App. 1991) quoting in turn, Johnson v. State, 390 So.2d 1160, 1167 (Ala.Crim.App. 1980). "`The intent of a defendant at the time of the offense is a jury question.'" C.G. v. State, 841 So.2d 281, 291
(Ala.Crim.App. 2001), aff'd, 841 So.2d 292 (Ala. 2002), quotingDowning v. State, 620 So.2d 983, 985 (Ala.Crim.App. 1993).
However, any "inconsistencies and contradictions in the State's evidence, as well as [any] conflict between the State's evidence and that offered by the appellant, [goes] to the weight of the evidence and [creates a question] of fact to be resolved by the jury." Rowell v. State, 647 So.2d 67, 69-70 (Ala.Crim.App. 1994). "`"[T]he credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine."'" Johnson v. State, 555 So.2d 818, 820
(Ala.Crim.App. 1989), quoting Harris v. State, 513 So.2d 79, 81
(Ala.Crim.App. 1987), quoting in turn Byrd v. State,24 Ala.App. 451, 451, 136 So. 431, 431 (1931). More importantly, "`[t]he question of the victim['s] credibility [is] one for the jury and not for this Court.'" Rowell, 647 So.2d at 69, quotingCoats v. State, 615 So.2d 1260, 1260 (Ala.Crim.App. 1992). "We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial." Johnson,555 So.2d at 820. "`When the jury has passed on the credibility of evidence tending to establish the defendant's guilt, this Court cannot disturb its finding.'" Rowell, 647 So.2d at 69, quotingCollins v. State, 412 So.2d 845, 846 (Ala.Crim.App. 1982). Furthermore, "`[t]his Court must view the evidence in the light most favorable to the State, and "draw all reasonable inferences and resolve all credibility choices in favor of the trier of fact."'" D.L. v. State, 625 So.2d 1201, 1204, (Ala.Crim.App. 1993), quoting Woodberry v. State, 497 So.2d 587, 590
(Ala.Crim.App. 1986). "Any issues regarding the weight and credibility of the evidence *Page 430 
are not reviewable on appeal once the state has made a prima facie case." Jones v. State, 719 So.2d 249, 255 (Ala.Crim.App. 1996), aff'd, 719 So.2d 256 (Ala. 1998).
Here, Lee testified that he recognized Buford as one of the three armed men who burst into the Hines residence and committed the acts alleged above. Lee's testimony alone, if believed, was sufficient to sustain Buford's capital-murder convictions. Whether Buford possessed the requisite intent to kill was a question for the jury. Similarly, to the extent that Buford's argument challenges the credibility of the State's witnesses or inconsistencies in those witnesses's testimonies or in the State's evidence, those arguments go to the weight of the evidence and were properly submitted to the jury for its consideration. Once the prima facie case was established, any inconsistencies or conflicts in the evidence were for the jury to resolve. The jury obviously resolved adversely to Buford the questions as to whether Buford was present and had the intent to kill and the questions surrounding the credibility of the State's witnesses. We will not disturb those findings on appeal.
 II.
Buford next argues that the trial court's sentence of life imprisonment without the possibility of parole "is a violation of [his] Eighth Amendment right to be free from cruel and unusual punishment" (Buford's brief at p. 25), because he has no prior felony convictions, and because, according to him, the evidence against him was circumstantial and demonstrated that he had a lesser degree of culpability than did the other individuals involved in the offenses.
In Foldi v. State, 861 So.2d 414 (Ala.Crim.App. 2002), the appellant challenged his sentence on Eighth Amendment grounds. This Court stated:
 "This issue was not preserved for appellate review: it was not first presented to the trial court. See Jordan v. State, 574 So.2d 1024, 1025 (Ala.Crim.App. 1990). Foldi failed to object to his sentence at the sentence hearing, in a motion for a new trial, or in a motion to reconsider his sentence. See Bishop v. State, 690 So.2d 502, 510 (Ala.Crim.App. 1996)."
861 So.2d at 424.
Here, as in Foldi, Buford did not raise this claim before the trial court and, thus, he has failed to preserve it for our review. See also Williams v. State, 666 So.2d 859, 860
(Ala.Crim.App. 1995); and Perry v. State, 741 So.2d 467
(Ala.Crim.App. 1999).[3]
Moreover, even if this issue had been preserved for review, no basis exists for vacating Buford's sentence.
In Adams v. State, 815 So.2d 583 (Ala.Crim.App. 2001), this Court stated:
 "It is well settled that `[w]here a trial judge imposes a sentence within the statutory range, this Court will not disturb that sentence on appeal absent a showing of an abuse of the trial judge's *Page 431 
discretion.' Alderman v. State, 615 So.2d 640, 649
(Ala.Crim.App. 1992). `The exception to this general rule is that "the appellate courts may review a sentence, which, although within the prescribed limitations, is so disproportionate to the offense charged that it constitutes a violation of a defendant's Eighth Amendment rights."' Brown [v. State, 611 So.2d 1194,] 1197, n. 6 [(Ala.Crim.App. 1992)], quoting Ex parte Maddox, 502 So.2d 786, 789
(Ala. 1986)."
815 So.2d at 585. Buford attempts to support his argument by attacking the sufficiency and weight of the evidence against him to argue that he was not personally involved in the shootings and that he did not know that a murder was going to be committed; however, the State presented a prima facie case of capital murder, and the jury, having been thoroughly instructed on the principles of accomplice liability and the application of accomplice liability to capital offenses, returned guilty verdicts against Buford on both capital counts charged in the indictment. Buford's sentences of life imprisonment without the possibility of parole were actually the minimum sentences that could be imposed. Even if this claim had been properly preserved for our review, for the foregoing reasons Buford would not have been entitled to any relief on this claim.
 III.
Buford challenges the trial court's denial of nearly all of the 47 jury instructions requested by the defense. However, it is well-settled that "[n]o party may assign as error the court's . . . failing to give a written instruction . . . unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection." Rule 21.3, Ala.R.Crim.P. See alsoGreenhill v. State, 746 So.2d 1064 (Ala.Crim.App. 1999); and Sanders v. State, 683 So.2d 14 (Ala.Crim.App. 1996). Similarly, "[t]he defendant is required to state with particularity the grounds of his objection to the court's refusal to give a requested charge." Miller v. State, 673 So.2d 819,820 (Ala.Crim.App. 1995). Finally, "[i]n order to preserve for review an objection to the giving or the denial of a jury instruction, it is necessary for the appellant to state for the record upon what specific grounds the objection is made." Cauleyv. State, 681 So.2d 1105, 1107 (Ala.Crim.App. 1996).
During the charge conference, defense counsel did not state specific grounds of objection with regard to the refused instructions. To the contrary, the defense appears to have either acquiesced in the trial court's denial of most of the instructions — many of which the trial court's reason for denial was that the requested instruction was similar to the trial court's own instructions — or remained silent when the trial court stated that it was refusing a number of the instructions. With regard to a few of the requested instructions, defense counsel asked whether the trial court's charge was to include certain language, to which the trial court responded by reading from its intended instruction and, there being no further discussion or objection by the defense, the trial court continued on to the next instruction. At the conclusion of the charge conference, Buford made the following objection: "For the record, with regard to our requested jury instructions, with the exception of number one, number forty-one, and number forty, we will object to you refusing to give those charges and take exception to that." (R. 891.) After the trial court had instructed the jury but before the jury retired to begin its deliberations, defense counsel stated: "[w]ith regard to the jury charges, Judge, we would renew our previously *Page 432 
made objection yesterday regarding the failure to give the requested instructions, with the exception of the two that we noted yesterday." (R. 1004.) Because Buford stated no grounds in support of his objection, this issue is not properly before this Court for review. See, e.g., Greenhill v. State, supra (merely excepting to the other charges previously mentioned without stating any grounds for the objection is not sufficient to preserve this issue for appellate review). Therefore, Buford is not entitled to any relief on this claim.
 IV.
Buford next argues that the trial court abused its discretion in denying his application for youthful-offender status. Specifically, he contends:
 "While the trial court indicated it looked at Buford's extensive criminal record as the basis of its decision, Buford had never been convicted of a felony offense prior to this conviction. (R. 210.) Based upon the shaky evidence the State relied upon to gain this conviction, and the paucity of credible circumstantial evidence in this matter, this is exactly the kind of case the youthful offender defendant [sic] the statute was intended [to] serve.
 "While the decision to grant or deny an eligible defendant youthful offender treatment may be matter solely within the trial court's discretion, the trial court's failure to exercise its discretion and look at the case and Buford's prior history, or lack thereof, is an abuse of the trial court's discretion."
(Buford's brief at p. 34-35.)
Although it appears that this issue was not properly preserved for appellate review, see Harris v. State, 794 So.2d 1214
(Ala.Crim.App. 2000), it is nonetheless without merit.
The record reflects that Buford applied for youthful-offender status and that the trial court ordered an investigation and set the matter for a hearing. At that hearing, the trial court asked the parties for argument on the youthful-offender application; the prosecution stated that it was submitting its argument on the youthful-offender report and the defense responded that it was "stand[ing] on the report" (R. 5.) and on letters provided to the trial court by some of Buford's friends and relatives. The trial court then stated: "The Court is going to deny Youthful Offender. I note that Mr. Buford has a fairly extensive juvenile record. That's one of the things I look at." (R. 6.) The following entry appears on the case action summary sheet:
 "6-23-00 In the above-styled matter, the defendant came before the court with his attorneys, the Honorable Robert Tutten and Honorable Patrick Tutten, for a hearing on defendant's Application for Youthful Offender Status. The State was represented by the Honorable Kristi Valls. The parties having stipulated to the facts contained in the investigation of the Parole and Probation Office, and the Court having considered the investigation submitted by the Parole and Probation Office, it is, therefore, ORDERED, ADJUDGED and DECREED BY THE COURT that defendant's application for youthful offender status is denied."
(C. 3.)
In Carden v. State, 621 So.2d 342 (Ala.Crim.App. 1992), this Court stated:
 "The trial court has almost absolute discretion in ruling on applications for youthful offender status, and the actions of the trial judge are presumptively correct in the absence of a showing to the contrary. Morgan v. State, 363 So.2d 1013 (Ala.Cr.App. 1978). *Page 433 
 "A trial judge is not required to recite his reasons for denying an application for youthful offender status in his order denying the application. Arrington v. State, 513 So.2d 40, 41-42
(Ala.Cr.App. 1987). It is sufficient if the order of denial reflects that some investigation, examination, or inquiry was conducted before the application for youthful offender status was denied. Talley v. State, 504 So.2d 741, 742-43 (Ala.Cr.App. 1987). A formal hearing on an application for youthful offender status is not required. Garrett v. State, 440 So.2d 1151, 1152 (Ala.[Crim.App.]1983). Where it does not affirmatively appear that the trial court's decision was arbitrary or that it was made without any examination or investigation, there is no basis for overturning the trial court's decision. Wilson v. State, 563 So.2d 11, 12 (Ala.Cr.App. 1989)."
621 So.2d at 345. In Wilson v. State, 777 So.2d 856
(Ala.Crim.App. 1999), this Court stated:
 "[A] trial court has almost absolute discretion in deciding whether to grant or to deny a defendant treatment as a youthful offender, and we will not overturn such a decision absent an affirmative showing that the decision was arbitrary or was made without some investigation or examination of the defendant."
777 So.2d at 923.
As indicated above, the trial court noted at the hearing on Buford's application for youthful-offender status that Buford "has a fairly extensive juvenile record," and stated, "That's one of the things I look at." (R. 6.) Further, the trial court's entry on the case action summary sheets indicated that it was denying Buford's application for youthful-offender status after "having considered the investigation submitted by the Parole and Probation Office." (C. 3.) As this Court has previously stated, "It is sufficient if the order of denial reflects that some investigation, examination, or inquiry was conducted before the application for youthful offender status was denied." Carden,621 So.2d at 345. It is well settled that we will not overturn the trial court's denial of youthful-offender status "absent an affirmative showing that the decision was arbitrary or was made without some investigation or examination of the defendant."Wilson, 777 So.2d at 923. Buford has made no such showing in the present case.
In light of the foregoing, Buford is not entitled to any relief on this issue.
 V.
Finally, Buford contends that the prosecutor's closing argument was improper for various reasons. Specifically, he claims (1) that the prosecutor misstated the law regarding complicity;[4] and (2) that the prosecutor infringed on his "Fifth Amendment right to remain silent as well as an infringement upon his Fourteenth Amendment Due Process Rights."[5] (Buford's brief at p. 40.) *Page 434 
The record reflects that Buford did not object to either of the above-referenced remarks at the time they were made. Rather, he raises this issue for the first time on appeal.
In Thomas v. State, 622 So.2d 415 (Ala.Crim.App. 1992), this Court stated:
 "The appellant's argument that the prosecutor made several improper comments in his closing argument to the jury is not preserved for review because there was no objection made at trial. Ex parte Wilhite, 485 So.2d 787, 789 (Ala. 1986).
 "`If counsel wishes to preserve for review any ruling of the trial court made during closing argument, he must object and point out to the Court that portion of the argument to which he objects and when that is done it is made a part of the record for appellate review.'
 "Embrey v. State, 283 Ala. 110, 120, 214 So.2d 567, 577 (1968)."
622 So.2d at 419-20. See also May v. State, 710 So.2d 1362,1373 (Ala.Crim.App. 1997) ("When no objection is made following a prosecutor's allegedly improper remark, a claim of error based on improper argument of counsel is not preserved for appellate review."). Because Buford did not object to the prosecutor's allegedly improper remarks at the time they were made, this issue is not properly before this Court for review.[6]
 VI.
Although not argued by Buford on appeal, we note that Buford's conviction for capital murder during a burglary and his conviction for burglary, as well as his conviction for capital murder during a robbery and his conviction for robbery, violate double jeopardy.
Count 1 of the indictment charged Buford with capital murder during the commission of a burglary as follows:
 "The grand jury of said county charge that before the finding of this indictment, OCTAVIOUS CORTE BUFORD, whose name is otherwise unknown to the grand jury, did on or about December 29, 1999, intentionally cause the death of *Page 435 
Quentin Troupe by shooting him with a pistol, and OCTAVIOUS CORTE BUFORD caused said death during the time that OCTAVIOUS CORTE BUFORD knowingly and unlawfully entered or remained, or attempted to enter or remain, unlawfully in the dwelling of Milton Hines, with intent to commit the crime of robbery, first degree, therein, and while effecting entry or while in the dwelling or in immediate flight therefrom, the said OCTAVIOUS CORTE BUFORD was armed with a pistol or shotgun, an explosive or deadly weapon, in violation of Section 13A-5-40(a)(4) of the Code of Alabama."
(C. 40.) Count 4 of the indictment charged Buford with burglary as follows:
 "The grand jury of said county further charge that before the finding of this indictment, OCTAVIOUS CORTE BUFORD, whose name is otherwise unknown to the grand jury, did on or about December 29, 1999, knowingly and unlawfully enter or remain unlawfully in a dwelling of Milton Hines, with intent to commit a crime therein to-wit: robbery, first degree, and while effecting entry or while in the dwelling or in immediate flight therefrom, said defendant or another participant, to-wit: GABRIEL BIRDSONG and LAVORIS DESHAWN HAMPTON were armed with an explosive or deadly weapon, to-wit: a pistol or a shotgun, in violation of Section 13A-7-5 of the Code of Alabama."
(C. 40.)
Count 2 of the indictment charged Buford with capital murder during a robbery as follows:
 "The grand jury of said county further charge that before the finding of this indictment, OCTAVIOUS CORTE BUFORD, whose name is otherwise unknown to the grand jury, did intentionally cause the death of another person, to-wit: QUENTIN TROUPE, by shooting him with a pistol, and the said OCTAVIOUS CORTE BUFORD did cause said death during the time that he was in the course of committing a theft of property, to-wit: United States currency, the property of Milton Hines or other occupants in the residence, by the use of force or by threatening the imminent use of force against the person of the said QUENTIN TROUPE, another person present, with the intent to overcome his physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the property, while the said OCTAVIOUS CORTE BUFORD was armed with a deadly weapon or dangerous instrument, to-wit: a pistol or shotgun, in violation of Section 13A-5-40(a)(2) of the Code of Alabama."
(C. 40.) Count 5 of the indictment charged Buford with robbery as follows:
 "The grand jury of said county further charge that before the finding of this indictment, OCTAVIOUS CORTE BUFORD, whose name is otherwise unknown to the grand jury, did on or about December 29, 1999, in the course of committing a theft of United States currency, the property of Milton Hines or other occupants of the residence, use force against the person of QUENTIN TROUPE, with intent to overcome his physical resistance or physical power of resistance, or threaten the imminent use of force against the person of QUENTIN TROUPE with intent to compel acquiescence to the taking of or escaping with the property, while the said OCTAVIOUS CORTE BUFORD was armed with a deadly weapon or dangerous instrument, to-wit: a pistol or shotgun, in violation of Section 13A-8-41 of the Code of Alabama."
(C. 41.)
It is well settled that "[a] defendant cannot be convicted of both a capital *Page 436 
offense and a lesser offense that is included in the capital charge." Adams v. State, [Ms. CR-98-0496, August 29, 2003] ___ So.2d ___, ___ (Ala.Crim.App. 2003). See also Turner v. State, [Ms. CR-99-1568, November 22, 2002] ___ So.2d ___ (Ala.Crim.App. 2002). Section 13A-1-8(b), Ala. Code 1975, provides, in pertinent part:
 "(b) When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if:
 "(1) One offense is included in the other, as defined in Section 13A-1-9."
Such a double-jeopardy transgression implicates the jurisdiction of the trial court and must be noticed by this Court regardless of whether it was raised. See, e.g., Straughn v. State,876 So.2d 492, (Ala.Crim.App. 2003) (opinion on return to remand and on application for rehearing); Borden v. State, 711 So.2d 498
(Ala.Crim.App. 1997), aff'd, 711 So.2d 506 (Ala. 1998); andRolling v. State, 673 So.2d 812 (Ala.Crim.App. 1995).
Based on the indictment, as well as our review of the record, it is clear that burglary as charged in count 4 of the indictment was a lesser-included offense of capital murder during a burglary as charged in count 1 of the indictment, and that robbery as charged in count 5 of the indictment was a lesser-included offense of capital murder during a robbery as charged in count 2 of the indictment. Therefore, Buford's convictions for burglary and robbery violated double-jeopardy principles, and the trial court lacked jurisdiction to adjudge him guilty of those offenses.
Based on the foregoing, we affirm Buford's two capital-murder convictions and his attempted-murder conviction, as well as the sentences imposed for those convictions. However, we remand this case for the trial court to vacate Buford's convictions and sentences for burglary under count 4 of the indictment and robbery under count 5 of the indictment.
AFFIRMED IN PART; REMANDED WITH DIRECTIONS.*
McMILLAN, P.J., and COBB and WISE, JJ., concur. BASCHAB, J., concurs in the result.
[1] Hampton and Birdsong were each indicted for the same offenses as Buford. Birdsong was convicted by a jury of all five counts and the jury recommended by a vote of 10 to 2 that Birdsong be sentenced to death. The trial court sentenced Birdsong to life imprisonment without the possibility of parole for each of the capital convictions, to 99 years' imprisonment for the attempted-murder conviction, to 99 years' imprisonment for the burglary conviction, and to 50 years' imprisonment for the robbery conviction. This Court affirmed Birdsong's convictions and sentences in an unpublished memorandum issued on March 14, 2003. Birdsong v. State (No. CR-01-0083),876 So.2d 1184 (Ala.Crim.App. 2003) (table).
Hampton pleaded guilty to one count of murder, one count of attempted murder, and one count of first-degree robbery. He was sentenced to life imprisonment for each conviction; those sentences were to run consecutively. At the time of the release of this opinion, Hampton has not filed an appeal.
[2] In its brief, the State claimed that Natasha Gibson had testified that she had previously given Birdsong a `blue, see-through Arch [brand] pager.' (R. 576, 577)" (State's brief at p. 8.) In his reply brief, Buford notes that Gibson did not testify at Buford's trial and has requested that this Court not consider that portion of the State's argument. This Court has not relied on the State's rendition of Gibson's testimony. Rather, the evidence in this case came from Grant Peoples's testimony that he found a blue translucent pager next to the SUV (R. 569-570), and on Corey Scott's testimony that Birdsong had a blue pager.
[3] Buford argues in his reply brief, in response to the State's argument that a number of Buford's claims were not preserved for appeal, that this Court should review those claims for plain error. However, it is well-settled that plain-error review only applies in those cases where the death penalty is imposed. See Rule 45A, Ala.R.App.P. "`In order to preserve the issue for appellate review, objections are still required in "capital cases" in which the death sentence is not imposed . . . Rule 45A, [Ala.]R.App.P., and the doctrine of plain error do not apply in cases in which the death penalty is not imposed.'"Myers v. State, 677 So.2d 807, 810-11 (Ala.Crim.App. 1995), quoting Thomas v. State, 622 So.2d 415, 420 (Ala.Crim.App. 1992).
[4] Buford quotes the following excerpt from the prosecutor's closing argument:
 "We wish we knew who the shooter was, but we don't know who the shooter is. We can speculate. You can speculate, but we don't know who the shooter is. And it doesn't matter under the law. It doesn't matter. Because you will hear what Judge will tell you. He will tell you when somebody else is responsible for the crime of another. And that is when they're in complicity."
(R. 901.)
[5] Buford quotes the following excerpt from the prosecutor's closing argument:
 "Now, what did he not say? He didn't tell him, you've got the wrong man. I was at my aunt's house. I was at my aunt's house. Now, wouldn't that have been important. You've got an alibi, you better tell it then. Tell them then where you were. He didn't say that. He didn't tell them, I was at my aunt's house, because ladies and gentlemen, he wasn't at his aunt's house. I was more likely to be at his aunt's house than he was. You heard Bobby Smith. You heard me ask her, `Are you sure this is the man? This man? Does he look the same? Are you sure this is him?' Because I know Bobby works for me and he doesn't work at the Sheriff's Department. And you heard him, 32 years of law enforcement experience, if he'd taken her statement it would have been recorded. If anybody had taken her statement it would have been recorded. Wouldn't that have been important to Investigator McNatt, to law enforcement if he said he [had] an alibi?
 "Because, ladies and gentlemen, I submit to you that we're not here to try to get evidence to convict this man, because he's not guilty. We don't do that. We don't build a case around who's not guilty. That doesn't happen. And if he had an alibi, if he had told that to anybody you would have heard that. He would have told it when he was asked about, when he was questioned."
(R. 942-43.)
[6] Although Buford did claim in his motion for a new trial that a third comment by the prosecutor was improper, that comment was not referenced on appeal. Further, we note that "`[g]enerally, improper argument of counsel is not a valid ground for a motion for a new trial or subject to review on appeal unless there is a timely and specific objection by counsel or a motion to exclude, and adverse ruling thereon by the trial court, or a refusal of the trial court to make a ruling, and an objection thereto.'" Steeley v. State, 622 So.2d 421, 423
(Ala.Crim.App. 1992), quoting Trawick v. State, 431 So.2d 574,578 (Ala.Crim.App. 1983).
* Note from the reporter of decisions: On May 21, 2004, on return to remand, the Court of Criminal Appeals affirmed, without opinion.