Scottie Fitzgerald Rowell, the appellant, and Andrew Lewis Wilson were separately indicted for the attempted murder of Jeffery Lamar Jones. On motion of the State, the two cases were consolidated for trial, and a jury convicted both defendants. Rowell was sentenced to 75 years' imprisonment and was ordered to pay $50.00 to the Crime Victims' Compensation Fund, $58,115.26 in restitution, and court costs. Rowell raises two issues in this appeal from his conviction.[1]
 I
The appellant challenges both the sufficiency and the weight of the evidence.
The State's evidence established the following. Around midnight on July 20, 1992, a *Page 68 
group of 15 to 20 people were gathered outside an apartment located at 330-B Pleasant Circle, in Opelika, Alabama. A number of people in the group were drinking alcohol. Elizabeth Watts, a cousin of Jeffery Lamar Jones, the victim, lived in Apartment 330-B.
Jones testified that he was sitting on a car parked outside his cousin's apartment drinking a beer when Charlie Davis, Andrew Lewis Wilson, and the appellant arrived in Davis' automobile. Jones stated that the appellant, whom he had known "[p]ractically all through school[,] . . . a long time," and Wilson walked over to where he was sitting, while Davis went to talk to some other people. R. 42-43. According to Jones, the appellant was staring at him
 "[a]nd I said, 'Why you staring at me?' And, you know, he didn't say anything. I said, 'What's up, man, why you starin' at me?' And he said, 'What's up with you? You got to give up some money.' . . . I didn't know what he's talkin' about, so I said, 'What money?' And he said the same thing, and he had his hand, you know, in his pocket."
R. 43. Jones stated that the appellant then pulled a pistol out of his pocket and pointed it at him. Jones described the pistol as a "three eighty." R. 69.
Jones testified that he "had drunk about six beers" at that point and "was already 'bout intoxicated," and that he tried "to walk away from trouble," and started walking toward his cousin's apartment. R. 54, 45. Before he reached the apartment, he heard Wilson say, "Shoot him! Shoot him!" R. 45. Jones stated that "as [he] reached to pull the door open," he was shot twice in the arm, and that, "before [he could] get in the house," he was shot twice in the back.Id. Jones said that he saw the appellant fire the first two shots that hit him. He testified that he did not see a gun in Wilson's possession or in the possession of anyone other than the appellant that night. Jones stated that he was hospitalized for approximately six weeks after the shooting. From his testimony on cross-examination, it appears that Jones was shot only once in the arm and that the bullet exited his arm, causing two wounds.
Several persons present at the scene of the shooting testified for the State. One of these witnesses testified that he saw the appellant at the scene prior to the shooting, but did not see who shot the victim. Another witness said that she saw Wilson at the scene, but did not know the appellant and did not see who shot the victim. This witness indicated that the shots were fired from an area other than the area in which the appellant was apparently located. Keith Ponds testified that he saw three men whom he did not know get out of "a light brown car." R. 107. Ponds stated that he saw one of the men "pull a gun out of his hip pocket" and he heard a shot fired and fell to the ground. He stated that he then heard "six more" shots. R. 108. Ponds said that the person with the gun was shooting toward Elizabeth Watts' apartment and that he saw the victim fall to the ground.
Harvey Sanford testified that Charlie Davis, Andrew Lewis Wilson, and the appellant arrived in a blue Datsun 280 automobile shortly before the shooting. Sanford stated that he observed Wilson and the appellant talking to the victim and that the appellant said "give it up or something . . . like that." R. 169. According to Sanford, the appellant repeated this statement once or twice, then "pulled [a] gun out" and began shooting at the victim, who was walking toward Apartment 330-B. R. 169-70. Sanford described the gun as a "380," and said that he "heard six shots, you know, but they said it only hit four, you know. I guess, you know, echoes." R. 170. Sanford stated that the victim opened the door to Apartment 330-B, then fell on the floor.
Detective E.D. Abernathy of the Opelika Police Department investigated the shooting. He testified that he recovered four shell casings at the scene. One casing was in the parking lot of the apartment complex; another was by the sidewalk in front of the apartments; the third was on "on the sidewalk just before you get up on the porch" of Apartment 330-B; and the fourth was on the front porch "right in the doorway" of Apartment 330-B. R. 143-45. Detective Abernathy stated that there were three bullet holes in the screen door of Apartment 330-B; that "two of the bullets went through the screen," *Page 69 
while "one went through the metal part of the screen door"; and that "it was very obvious that the bullets were fired from the outside through the door into the interior of the room." R. 146, 148. Abernathy said that a window in Apartment 330-B had been broken by a bullet. One spent bullet was recovered in the house.
Joe Saloom, a firearms examiner, testified that he examined two bullets removed from the victim's abdominal area and the bullet found in Apartment 330-B and that all three bullets were fired from the same gun. He stated that the noses of the two bullets removed from the victim were "marked in a manner that is consistent with a passage of the bullet through something similar to a window screen, if it was not a window screen." R. 222-23.
The appellant testified in his own behalf. He stated that on the night of the shooting, he went to the apartments on Pleasant Circle with Charlie Davis and Andrew Lewis Wilson. He said that he and Wilson walked over to Jones and that he observed Jones sell Wilson some drugs. The appellant denied having a gun that night. He stated that he did not shoot Jones and that he did not know who did so. Wilson, the codefendant, did not testify.
As noted above, the appellant challenges both the sufficiency and the weight of the evidence. We have previously explained the difference between the two:
 "The sufficiency of the evidence concerns the question of whether, 'viewing the evidence in the light most favorable to the prosecution, [a] rational fact finder could have found the defendant guilty beyond a reasonable doubt.' Tibbs v. Florida, 457 U.S. 31, 37, 102 S.Ct. 2211, 2216, 72 L.Ed.2d 652 (1982). Accord, Prantl v. State, 462 So.2d 781, 784 (Ala.Cr.App. 1984). . . .
 "In contrast, '[t]he "weight of the evidence" refers to "a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other." ' Tibbs v. Florida, 457 U.S. at 37-38, 102 S.Ct. at 2216."
Johnson v. State, 555 So.2d 818, 819-20 (Ala.Cr.App. 1989) (emphasis added in Johnson).
In this case, the evidence was clearly sufficient: the testimony of the victim, who knew the appellant and positively identified the appellant as the person who shot him, alone established a prima facie case of attempted murder. SeeChristianson v. State, 601 So.2d 512, 520 (Ala.Cr.App. 1992);Barnes v. State, 571 So.2d 372, 374-75 (Ala.Cr.App. 1990). See also Ala. Code 1975, §§ 13A-4-2(a); 13A-6-2(a)(1). Additionally, the victim's testimony was corroborated by that of Harvey Sanford, who also identified the appellant as the person who shot the victim.
The gist of the appellant's argument is that the victim's testimony is not credible because 1) he admitted that he was intoxicated at the time of the shooting and 2) he testified that he was shot while outside his cousin's apartment, but the testimony of both the investigating officer and the firearms expert indicates that he was shot while inside the apartment. "The question of the victim['s] credibility was one for the jury and not for this Court." Coats v. State,615 So.2d 1260 (Ala.Cr.App. 1992). The victim's intoxication at the time of the shooting was merely a factor for the jury to consider in determining the credibility of his testimony. SeeState v. Coats, 46 N.C. App. 615, 265 S.E.2d 486, 487, no error found, 301 N.C. 216, 270 S.E.2d 422 (1980). Cf. Commonwealth v.Hudson, 489 Pa. 620, 414 A.2d 1381, 1385 (1980) (prosecution witness' "physical condition after consuming drugs is a matter of credibility to be considered by the jury"). "When the jury has passed on the credibility of evidence tending to establish the defendant's guilt, this Court cannot disturb its finding."Collins v. State, 412 So.2d 845, 846 (Ala.Cr.App. 1982).
Furthermore, where, as in this case, "the State establishes a prima facie case, conflicting evidence presents a jury question, which is not subject to review on appeal.Willis v. State, 447 So.2d 199, 201 (Ala.Cr.App. 1983)." Davisv. State, 593 So.2d 145, 148 (Ala.Cr.App. 1991). The inconsistencies and contradictions in the State's evidence, as well as the conflict between the State's evidence and that offered by the appellant, went *Page 70 
to the weight of the evidence and created questions of fact to be resolved by the jury. Barger v. State, 562 So.2d 650, 652
(Ala.Cr.App. 1989) (inconsistencies and contradictions in evidence "raise questions of weight, not sufficiency, and present credibility issues for the jury"), cert. denied,562 So.2d 656 (Ala. 1990). See also Waddle v. State, 473 So.2d 580,582 (Ala.Cr.App. 1985) ("where there is a conflict in the evidence, the inferences to be drawn from the evidence, the weight of the evidence, and the credibility of the witnesses are all questions for the jury"). " 'We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial.' . . . Johnson v. State,555 So.2d 818, 820 (Ala.Cr.App. 1989)." Duncan v. State,624 So.2d 1084, 1089 (Ala.Cr.App. 1993).
 II
The appellant contends that his defense was unduly prejudiced when the prosecutor questioned him about his certification to stand trial as an adult.
During cross-examination of the appellant, the prosecutor established that the appellant was arrested in Atlanta, Georgia, for the instant offense. After a series of questions on a completely different matter that prompted several objections from both the appellant's counsel and counsel for codefendant Wilson, the following occurred:
 "Q. [By prosecutor:] After you were brought back from Atlanta, I believe you were certified to stand trial as an adult by the juvenile court, is that correct?
 "[Appellant's counsel]: I'm going to object to proceedings that occurred in juvenile court and move for a mistrial. It's improper to be brought into court.
"THE COURT: Sustain the objection.
 "[Appellant's counsel]: Did you sustain the motion for a mistrial?
"THE COURT: No."
R. 265-66. This matter was not mentioned again at trial.
Under Alabama law, a "juvenile court adjudication [of delinquency] cannot be introduced to impeach a witness even if the adjudication was for a crime involving moral turpitude." C. Gamble, McElroy's Alabama Evidence § 145.01(4) (4th ed. 1991). The appellant argues that the fact that a juvenile defendant has been certified to stand trial as an adult is similarly inadmissible for impeachment purposes. We agree.
Section 12-15-72, Ala. Code 1975, provides:
 "(a) An order of disposition or other adjudication in proceedings under subsection (a) of section 12-15-30 shall not be considered to be a conviction or impose any civil disabilities ordinarily resulting from a conviction of a crime or operate to disqualify the child in any civil service application or appointment.
 "(b) The disposition of a child . . . shall not be admissible as evidence against him in any case or proceeding in any other court whether before or after reaching majority, except in a disposition hearing in a juvenile court or in sentencing proceedings after conviction of a crime for the purposes of a presentence report." (Emphasis added.)
Section 12-15-30(a), referred to in § 12-15-72(a) and entitled "Original jurisdiction generally — Children," provides that "[t]he juvenile court shall exercise exclusive original jurisdiction of proceedings in which a child is alleged to be delinquent, dependent or in need of supervision."
A certification, or transfer, hearing by its very nature arises only in a "proceeding in which a child is alleged to be delinquent." See § 12-15-34(a). Consequently, the juvenile court's order certifying the juvenile to stand trial as an adult is "[a]n order of disposition or other adjudication in [a] proceeding under subsection (a) of section 12-15-30." § 12-15-72(a). Under § 12-15-72, then, the fact that a juvenile has been certified to stand trial as an adult "shall not be considered to be a conviction" and "shall not be admissible as evidence against him in any case or proceeding in any other court," including his subsequent trial as an adult.
We are well aware "that the absolute proscription of § 12-15-72 cannot always prevail." Barnett v. State,517 So.2d 641, 642 (Ala.Cr.App. 1987). In Ex parte Lynn, 477 So.2d 1385,1387 (Ala. 1985), the Alabama Supreme *Page 71 
Court held that a capital murder defendant's "right to thorough and sifting cross-examination was unduly hampered by the trial court's granting of the State's motion to preclude defense counsel from making any reference to [the] juvenile record" of the State's witness, who was "an admitted accomplice to the crime." In Barnett v. State, 517 So.2d at 642, this Court refused to permit a defendant to use § 12-15-72 to prevent his conviction "as an adult offender for escaping from custody imposed pursuant to an order of the juvenile court."
The present case, however, does not involve a situation requiring the relaxation of the provisions of § 12-15-72. It does not appear that the prosecutor's question to the appellant concerning the appellant's having been certified to stand trial as an adult served any legitimate purpose, and that question was therefore improper under § 12-15-72.
While the prosecutor's question was improper, we find that the error was harmless under the particular facts of this case. See Rule 45, A.R.App.P. As noted above, this question was posed to the appellant after a series of questions and objections on another matter and it is doubtful that it made much of an impression upon the jurors. The question was not repeated, was not answered, and the objection to it was sustained. Compare Coral v. State, 628 So.2d 954, 981
(Ala.Cr.App. 1992) (where defense counsel objected and moved for mistrial after prosecutor's question to police officer concerning other alleged crimes by defendant, trial court's action in sustaining the objection was sufficient), affirmed,628 So.2d 1004 (Ala. 1993), cert. denied, ___ U.S. ___,114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). This case simply does not demonstrate the "high degree of 'manifest necessity' [required] for the granting of a mistrial." Wadsworth v. State,439 So.2d 790, 792 (Ala.Cr.App. 1983), cert. denied, 466 U.S. 930,104 S.Ct. 1716, 80 L.Ed.2d 188 (1984). While the timely motion for a mistrial "preserve[d] for review lesser prayers for relief, such as . . . [a] motion to strike," Ex parte Marek,556 So.2d 375, 379 (Ala. 1989), the failure to give curative instructions was not reversible error, see Coral v. State, 628 So.2d at 981. Under the facts of this case, including the strong evidence against the appellant, we conclude that the jury would have returned the same verdict had this question not been asked or had the trial court instructed it to disregard the question. See generally Ex parte Greathouse, 624 So.2d 208, 210-11 (Ala. 1993).
For the reasons stated above, the judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] A separate appeal by Wilson is pending before this Court.Wilson v. State, CR 93-724.