WELCH, Presiding Judge.
 

 A Randolph County grand jury returned a three-count indictment against Curtis Dale Brooks on February 17, 2009, charging him with three counts of first-degree robbery. § 13A-8-41, Ala.Code 1975. Count 1 charged that, while Brooks was engaged in the theft of currency belonging to Mildred Freeman, he was armed with a pistol and used force or threatened the use of force against Freeman or another person with the intent to overcome her resistance or to compel her acquiescence. Count 2 charged that, while Brooks was engaged in the theft of currency belonging to Tony White, he was armed with a pistol and used force or threatened the use of force against White or another person with
 
 *277
 
 the intent to overcome his resistance or to compel his acquiescence. Count 3 charged that, while Brooks was engaged in the theft of currency belonging to Ann’s Flowers and Gifts retail flower shop, he was armed with a pistol and used force or threatened the use of force against Tony White and/or Mildred Freeman, employees of the flower shop, or another person with the intent to overcome his resistance or to compel his acquiescence. Brooks was tried before a jury and was convicted on all counts. Brooks filed a motion for a judgment of acquittal or for a new trial, arguing that the evidence was insufficient to support a finding of guilty beyond a reasonable doubt and that the verdicts were contrary to the great weight of the evidence. The trial court denied the motion. The trial court sentenced Brooks, a habitual felony offender, to 85 years’ imprisonment;
 
 [1]
 
 the court also ordered Brooks to pay a victim’s compensation assessment, court costs, attorney fees, and restitution. This appeal follows.
 

 Investigator James Bailey testified that he was employed with the Roanoke Police Department and that he responded to a report of a robbery on June 28, 2008, at Ann’s Flowers and Gifts, a retail flower shop. He interviewed witnesses Tony White, Mildred Freeman, and Ann Napier. He obtained a description of the robber, who fled the scene on foot, so patrol officers could be on the lookout for him. The robber was described as a dark-complected black male, approximately 5 feet 10 inches tall, with a noticeable dental overbite. Bailey testified that White had waited on the man when he came into the shop, so he had the best opportunity to observe the robber’s physical characteristics. Bailey showed White a photographic lineup with six men who matched the suspect’s physical description. Brooks’s photograph was not in the lineup. White was unable to identify the robber from those photographs.
 

 Bailey then presented White with photographs of every black male the police department had arrested previously; he estimated there were between 300 and 500 photographs. Brooks’s photograph was not among those photographs. White was unable to identify the robber from those photographs. Bailey said that he was notified later — while he was on vacation — that White had identified Brooks at a grocery store in the area.
 

 Bailey testified that he processed the crime scene for fingerprints but that he found no prints of value. He searched outside the building for evidence, such as clothing, and he found nothing.
 

 Bailey testified that he interviewed Brooks on July 14, 2008. Brooks told him that he had not been in Roanoke on the day of the robbery. He said that he had been working with his boss, Luke Gun-nells, and another man in Lee County, and that he had later spent time with one of his girlfriends, Zanetta Hicks, at her hairdresser’s shop. Bailey testified that he spoke to Gunnells, both of Brooks’s girlfriends, and Hicks’s hairdresser, and none of the witnesses could corroborate anything Brooks had told him.
 

 Investigator Jonathan Caldwell testified that he was employed by the Roanoke Police Department and that he investigated the robbery while Bailey was on vacation. He said that he showed White additional photographic lineups to see if he recognized the robber, but White did not. Brooks’s photograph was not in any of
 
 *278
 
 those lineups. Caldwell said that he was notified that White had seen the robber again, at a grocery store in Lanett, on July 10, 2008. Caldwell and Roanoke Police Chief Adam Melton interviewed Brooks at the police department. Brooks stated that on the day of the robbery, he had been working with Luke Gunnells in Dadeville all day and that he did not go to Roanoke that day. Brooks’s vehicle and a residence where he was staying were searched on July 10, but no evidence connected to the robbery was recovered.
 

 Caldwell testified that the prosecutor obtained Brooks’s cellular-telephone records for the date of the robbery and that none of the records indicated that Brooks had made any calls in the Roanoke area on that date. Caldwell also testified that there was no cellular-transmission tower in Roanoke. The call records indicated that Brooks had been in the Lanett area on June 28. The closest cell-phone tower to Roanoke was located in LaFayette, Caldwell said, and he estimated that LaFayette was located 20-30 minutes by automobile from Roanoke. Caldwell was unable to determine the time zone used in the cellular-telephone records, so he could not determine the times when Brooks’s calls were made on the date of the robbery. Caldwell said it was possible that Brooks was in Roanoke at the time the robbery was committed.
 

 Defense counsel asked Caldwell whether he had spoken with Mildred Freeman, Ann Napier, and Malcolm Rowland, witnesses who had been inside the shop or had seen the robber, and whether they had identified Brooks from a photographic lineup. Caldwell said that Freeman and Napier were not sure of an identification and that Rowland had identified Brooks from the lineup.
 

 Chief Melton testified about his participation in the investigation of the robbery and of Brooks’s arrest after White saw him in Lanett. Melton testified that he spoke with Brooks’s employer, Luke Gunnells, on two occasions. Gunnells first stated that Brooks had been with him on the date of the robbery, but he telephoned later and told investigators that his information had been incorrect and that Brooks had not been with him on that date.
 

 Robyn
 
 [2]
 
 Barnes testified that she is a hairdresser in Lanett and that Zanetta Hicks had been a client of hers. Barnes testified that she kept records of her clients and that she showed the record book to the police when they came to her shop in June or July 2008. The book showed that Barnes had last styled Hicks’s hair on May 17, 2008.
 

 Tony White testified that he worked full-time at a Kroger grocery store in Lanett, and that he worked part-time at Ann’s Flowers and Gifts. Ann Napier, the owner, is his mother-in-law, he said. White testified that on the morning of June 28, 2008, he was working in the shop with Napier when a black man he identified as Brooks came into the store. He was wearing blue jeans and a white t-shirt. White and Napier assisted Brooks, who said he wanted to buy a picture frame like the one his grandmother had previously purchased in the shop. White testified that he spent more than five minutes with Brooks while Brooks looked at picture frames. He noticed that Brooks had an overbite and crooked teeth. According to White, while he was helping Brooks, Napier waited on another customer, and Brooks might have seen her place a $100 bill into the cash register when that customer paid. Brooks left the store, saying he wanted to ask his grandmother about the picture frame.
 

 
 *279
 
 Brooks returned to the store 10 or 15 minutes later. White was in the back of the store and Napier was in the restroom. Brooks had changed into coveralls before he returned to the store, White said. White testified that he knew something was going to happen because Brooks had put on coveralls before he returned, but said he could not leave his mother-in-law in the store alone so he waited on Brooks, who said he wanted to buy a picture frame. After White wrote out a receipt for the purchase of a picture frame, Brooks reached into a pocket of the coveralls and pulled out a handgun, which he pointed at White. Brooks told White to give him the money, so White opened the cash register and gave Brooks the cash in the drawer and then closed the register. Brooks pointed the gun at him again and demanded the money from beneath the drawer. White opened the cash register again and gave Brooks the $100 bill Napier had received from the customer who had been in the store when Brooks was first there.
 

 White testified that Brooks then directed him to go to the back of the store. In the meantime Mildred Freeman had returned to the store after making a delivery. Brooks demanded that White give him the money from his wallet and that Freeman give him the money from her purse, and he pointed the gun at them while he demanded their money. After White and Freeman gave their money to Brooks, he ordered them to lie on the floor in the back room. They did as they were instructed, and they prayed, White said. Brooks pointed the gun at them and told them twice not to get up until he told them to do so, then he walked to the front of the shop. Again he told them to stay on the floor. White testified that, as soon as he heard the bell on the front door ring when Brooks exited the front of the store, he got up and called emergency 9-1-1. He saw Brooks pass by the front window as he ran from the store.
 

 White testified that he looked at a lot of photographs from the police department but that he was never able to identify the robber. Then, just as he arrived for his shift at the Kroger grocery store on July 10, 2008, he noticed that the man walking next to him was the man who had robbed him. White observed Brooks as he walked through the store so he could be certain of his identification, and as Brooks exited the store White told a coworker to call 9-1-1. White testified that he was 100% certain that Brooks was the man who had robbed him.
 

 Mildred Freeman testified that she works part-time at Ann’s Flowers and Gifts and that Ann is her sister. She said that on the Saturday of the robbery she returned to the store from making a delivery and she saw someone bent over at the front counter, and she thought someone was looking in a display ease. Then the man came into the back room and pointed a gun in her face. He was wearing baggy coveralls and something on his head. He demanded money, and she said she had none. The robber pointed at her purse in the workroom and told her to get her money for him. She gave him the money, and he told her to lie on the floor. White was already on the floor, she said. The robber told them not to move, and he kept the gun pointed at them. Freeman said she prayed. After the robber left, White got up to call 9-1-1. She asked White where Napier was and he told her that she was in the bathroom.
 

 Freeman testified that she could not say with 100% certainty that Brooks was the man who had robbed her because during the robbery her attention had been focused on the gun that was pointed at her. She testified that she had looked at some photographic lineups and that she had not
 
 *280
 
 identified anyone from the photographs. Freeman testified that she had not noticed whether the robber had a beard or a mustache.
 

 Ann Napier testified that she owned Ann’s Flowers and Gifts retail flower shop. She said that before the robbery, she was waiting on a customer when a man came in. She called to White and asked him to wait on the man. After the customer left the store, Napier went to assist White and the man, who was looking for a specific type of picture frame. The man left, stating he needed to ask his grandmother about one of the frames. After he left the store, she went into the restroom; she did not see the man return. Napier testified that she was not aware of the robbery until Freeman came and banged on the bathroom door and told her.
 

 Napier testified that she usually starts a business day with approximately $200 in the cash register.
 

 Napier testified that she looked at photographic lineups at the police department but that she was unable to identify the robber in any of the photographs. She also said that she does not really look at customers as far as noticing their personal appearance; rather, she said, she pays attention to what a customer wants. She could not testify that Brooks was the man she saw in the store on the day of the robbery.
 

 After the State presented the foregoing evidence, Brooks made a motion for a judgment of acquittal and argued only “reasonable doubt.”
 

 Elizabeth Trammell testified that she was cleaning the business located across the street from the flower shop on the morning of the robbery. She glanced up and saw a black man walk into the business, and she saw him walk out again. He waved at her. Trammell testified that she did not notice anything about the man’s appearance, and she did not know whether Brooks was the man she saw that day.
 

 Susan Craven testified that she was working in a cellular-telephone store near Ann’s Flowers and Gifts on the morning of the robbery. She said a black man came into the store and asked to have his telephone service restored, but when she placed a telephone call to assist him, the man became angry, slammed the phone down onto the counter, and walked out. He walked in the direction of the flower shop. Craven could not identify Brooks as the man who was in the store. Craven acknowledged that she had looked at some photographs provided by the police on July 16, 2008. She had identified Brooks and another man from the photographs as possibly being the person who came into the store on the day of the robbery. Craven said that she did not tell the officers that she was certain that the man she waited on was Brooks or the other man whose photograph she had selected.
 

 Zanetta Tywan Hicks testified that she had been involved in a relationship with Brooks on June 28, 2008. She said that Brooks took her to Abbey Shealey’s to have her hair done on that afternoon. Hicks testified that if she told the police that Brooks had taken her Robyn’s to have her hair done that day, that would have been a mistake on her part. Hicks stated that she has serious medical problems and that those problems had affected her memory. Nonetheless, she stated she was certain that, on the day of the robbery, Brooks took her to Shealey’s and then he took her home.
 

 The State cross-examined Hicks about numerous inconsistencies between her statement to the police and her testimony in court and inconsistencies between her testimony and Brooks’s statement to the police. In the statement to the police, she
 
 *281
 
 said that Brooks left her early in the morning to go to work and returned in the afternoon and that she did not know where he had been in between. In her in-court testimony, she said that Brooks had taken her to the beauty salon at approximately 9:30 or 10:00 a.m. and picked her up in the early afternoon. The State also presented a statement Hicks provided to the police, along with a calendar she had filled out. The statement included the following: “About two days ago I started this calendar that y’all got to keep Curtis out of jail and to give him an alibi for that Saturday.” (R. 168.) She made a statement to the police and gave the calendar to the police on July 15, 2008, but she acknowledged that the calendar included entries about her health status on July 16, 17, and 18, 2008. Hicks could not account for her ability to make entries on the calendar about her health for the days after she gave the calendar to the police.
 

 Luke Gunnells testified that he owned and operated Southern Sanitary Company in West Point, Georgia, and that Brooks had worked for him until he was arrested on the current charges. Gunnells testified that Brooks had worked with him on the morning of the robbery but that he did not see Brooks later in the day. Gunnells had initially told the police that Brooks had worked with him for the entire day, but he testified that he realized that he had misspoken, and he contacted the police to correct his initial statement. Brooks never wore coveralls when he worked for Gun-nells; he always wore blue jeans, a shirt, and a baseball hat, Gunnells said. Gun-nells testified on cross-examination that he knew Brooks had previously been in prison. Gunnells said they had had long conversations about that and that Brooks had told him he had learned his lesson and he never wanted to go back to prison. Gun-nells stated that he had believed Brooks and that is why he did not believe that Brooks committed the robbery at the flower shop. Gunnells also testified that he was with Brooks beginning at approximately 6:30 a.m. on the day of the robbery, and they had spent a couple of hours together.
 

 Abbey Shealey testified that she is a cosmetologist in West Point, Georgia. Shealey stated that Zanetta Hicks had an appointment to get her hair done on June 28, 2008, and that she was in the salon from approximately 9:00 or 9:30 a.m. until approximately 12:30 or 1:00 p.m. She said a man dropped Hicks off for the appointment, and that Brooks came into her shop to pick up Hicks after the appointment. Shealey said that she was finishing Hicks’s eyebrows, and that Brooks had had to wait a minute or two in the salon.
 

 On cross-examination Shealey testified that Hicks came to the salon for two additional appointments after June 28, 2008, but she could not recall details such as the dates of the subsequent appointments, who brought Hicks to the appointment or picked her up, what vehicle the person was driving, or how long the appointments lasted. Shealey testified that she does not keep up with dates but that Hicks had come to her salon during the summer of 2009 and asked whether Shealey’s records reflected her June 28, 2008, appointment. Shealey then testified on redirect examination that Hicks had “said something about she needed the date because something had supposedly happened on that date that her boyfriend was accused of and she needed to know if I had it down that she was there, that he had brought her.” (R. 213.) The records she had for June 28, 2008, she gave to Hicks, Shealey said on recross-examination. She also said she did not know whether her records reflected the appointments Hicks had with her after June 28.
 

 
 *282
 
 Malcolm Rowland testified that he was in his van outside Ann’s Flowers and Gifts when the robbery occurred. He did not glance long at the man who, he realized later, had committed the robbery, but he noted that the man who walked into the shop was short and that he was wearing what appeared to be a toboggan-style hat and a dingy shirt. Rowland testified that he viewed a photographic lineup prepared by the police department but that he could not identify Brooks in court as the person whose photograph he had selected. On cross-examination, however, Rowland examined the photographs he had viewed at the police department on July 14, 2008. Rowland testified that he had selected photograph number six as the person he had seen at the flower shop, and photograph number six was identified as Curtis Brooks. Rowland stated that he could not say that the person in court was the same person he had seen at the flower shop because the man’s face had changed since he saw the man two years earlier. Finally, on redirect examination, Rowland testified that when he selected Brooks’s photograph from the photographic lineup, he had indicated on the lineup sheet that he was “60 percent sure” that the eyes were those of the man he had seen at the store, and he said the person in the photograph had the same body style.
 

 Mary Rowland testified that she was in Ann’s Flowers and Gifts shop before the robbery occurred and that she glanced for a few seconds at the man who later robbed the store, who was in the store at the same time she was. She said she had not identified anyone from the photographic lineup the police showed her, and she could not state in court that Brooks was the man she saw that day.
 

 Investigator Caldwell examined cellular-telephone records of calls to and from Brooks’s telephone. He could not discern from the records the time zone that applied to the various calls, but noted that “PDT” was indicated on the records. Caldwell said that he did not know how many hours’ difference there was between the Central time zone and the Pacific time zone. Investigator Caldwell further testified that authorities never determined whether Brooks had the cellular telephone with him during the robbery.
 

 At the conclusion of the evidence Brooks renewed his motion for a judgment of acquittal and again argued, simply, reasonable doubt. The trial court denied the motion. The trial court permitted the defense to reopen the case after Brooks stated that he wanted to testify.
 

 Brooks testified that he had never been to Ann’s Flowers and Gifts shop in Roanoke. He testified that he had gone to work with Gunnells on June 28, 2008, and had waited in the parking lot of a man’s store because he and Gunnells were supposed to pick up some cabinets from the man. They waited for over two hours, Brooks said, but the man did not arrive. Brooks said that his fiancée, Hicks, telephoned him and wanted him to take her to Abbey Shealey’s salon to have her hair done. Gunnells let him go, Brooks said, and he took Hicks to the salon, then spent time traveling in the area and picking up scrap metal. He also stopped at his brother’s house and at his sister’s house, and he visited with them. After noon, Hicks telephoned him and he went to pick her up. She was sitting under the hair dryer when he arrived at the salon, he said.
 

 Brooks said that he did not know Tony White and that he saw him for the first time when White came to the jail. Brooks said he did not own a pair of coveralls and that he had never owned coveralls. He also said that he had never owned or worn a toboggan-style hat. He denied committing the robbery and said he was certain
 
 *283
 
 that he had been picking up scrap metal on June 28.
 

 On cross-examination Brooks acknowledged that in the statement he made to the police on July 10, 2008, he said he had spent June 28, 2008, working at Gunnells’s camp in Dadeville, and that he had left there at approximately 3:00 p.m. He said he had never been to the flower shop, and that the people who had identified him as the person in the flower shop were mistaken. He acknowledged that he had told the investigators that he would do anything not to have to go back to prison. He testified that he had spent 18 years in prison for robbery. Brooks said he had been convicted of theft of property and receiving stolen property but that he did not know how many felonies he had committed.
 

 Also on cross-examination Brooks said that, although Shealey had testified that he had had to wait only a minute or two for her to finish Hicks’s eyebrows, he was sure Hicks was sitting under the hair dryer when he arrived and that he had to wait 15 minutes for her.
 

 The trial court charged the jury on, and the jury found Brooks guilty of, three counts of robbery, as charged in the indictment. Immediately after the trial court adjudged Brooks guilty of the three counts of robbery the State invoked the provisions of the Habitual Felony Offender Act, § 13A-5-9, Ala.Code 1975. The trial court held a sentencing hearing and the State presented certified copies of four prior felony convictions of Brooks’s. Defense counsel acknowledged that Brooks had some prior Class C felonies and one Class B felony. Brooks was on parole following 18 years’ imprisonment on a charge of second-degree robbery, which the prosecutor alleged, started out as a charge of first-degree robbery; Brooks pled guilty to the reduced charge, the prosecutor stated. The trial court sentenced Brooks to 85 years’ imprisonment.
 

 I.
 

 Brooks argues that the trial ’court erred when it denied the motion for a new trial because, he says, the jury ignored the great weight of the evidence by disregarding the alibi testimony and the inability of “numerous witnesses” to identify him. He argues that, after allowing all reasonable presumptions of correctness, the “verdict is unjust and so against the weight of the evidence” that the case must be remanded for a new trial. (Brooks’ brief, at pp. 7-8.) Brooks argues that eyewitness testimony is unreliable and fallible. He also argues:
 

 “One positive eyewitness, five witnesses who were unsure or could offer no identification at all, and no forensic evidence tied Brooks to the scene. Yet the jury chose to ignore all exculpatory evidence and concentrate on one witness alone. This Court should remand this case to the trial court because Brooks’ jury was unreasonable and ignored the great weight of the evidence.”
 

 (Brooks’ brief, at p. 22.)
 

 Brooks also argues that the cellular-telephone records proved that he was not in Roanoke at the time of the robbery.
 

 The State argues that because the prosecutor presented a prima facie case at trial, the factual questions and credibility of the witnesses were matters for the jury to decide and that the jury’s verdict is conclusive on appeal. The State contends that caselaw establishes that a jury’s verdict should be set aside only when that verdict is contrary to the great weight of the evidence and palpably wrong or unjust and that the jury’s verdicts here are supported by the evidence. Therefore, the State concludes, the trial court did not
 
 *284
 
 err when it denied the motion for a new trial. We agree with the State.
 

 “With respect to the weight of the evidence, it is well-settled that any ‘inconsistencies and contradictions in the State’s evidence, as well as [any] conflict between the State’s evidence and that offered by the appellant, [go] to the weight of the evidence and [create a question] of fact to be resolved by the jury.’
 
 Rowell v. State,
 
 647 So.2d 67, 69-70 (Ala.Crim.App.1994). ‘ “ ‘[T]he credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine.’ ” ’
 
 Johnson v. State,
 
 555 So.2d 818, 820 (Ala.Crim.App.1989), quoting
 
 Harris v. State,
 
 513 So.2d 79, 81 (Ala.Crim.App.1987), quoting in turn
 
 Byrd v. State,
 
 24 Ala.App. 451, 451, 136 So. 431, 431 (1931). ‘We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial.’
 
 Johnson,
 
 555 So.2d at 820. ‘ “When the jury has passed on the credibility of evidence tending to establish the defendant’s guilt, this Court cannot disturb its finding.” ’
 
 Rowell,
 
 647 So.2d at 69, quoting
 
 Collins v. State,
 
 412 So.2d 845, 846 (Ala.Crim.App.1982). Furthermore, ‘ “[t]his Court must view the evidence in the light most favorable to the State, and ‘draw all reasonable inferences and resolve all credibility choices in favor of the trier of fact.’ ” ’
 
 D.L. v. State,
 
 625 So.2d 1201, 1204 (Ala.Crim.App.1993), quoting
 
 Woodberry v. State,
 
 497 So.2d 587, 590 (Ala.Crim.App.1986). ‘Any issues regarding the weight and credibility of the evidence are not reviewable on appeal once the state has made a prima facie case.’
 
 Jones v. State,
 
 719 So.2d [249] at 255 [(Ala.Crim.App.1996) ].”
 

 Williams v. State,
 
 10 So.3d 1083, 1087 (Ala.Crim.App.2008).
 

 The State correctly notes that Brooks does not challenge the sufficiency of the evidence or otherwise allege that the State failed to present a prima facie case of robbery. In fact, the State presented evidence to show that Brooks held the two employees at gunpoint while he took the money from the cash register and from each employee, thus establishing the elements of robbery. It is apparent that the jury chose to believe the State’s witnesses, and particularly White’s identification of Brooks as the robber, and that it chose not to believe the testimony and arguments presented by the defense. The witnesses for the State and the defense were subjected to thorough cross-examination, and the parties had the opportunity to argue the relative strengths and weaknesses of the evidence. The veracity of the witnesses and the credibility of the evidence were properly left for the jury to determine, and the trial court did not abuse its discretion when it declined to disturb the jury’s verdict.
 

 Brooks argues that the jury should not have believed the State’s evidence, however, and that
 

 “[t]his Court, then, must apply its own subjective beliefs and experience when deciding this appeal. Doing so requires this Court to overturn the conviction rendered by an unreasonable jury that ignored the greater weight of the evidence and improperly relied on insufficient evidence to find Brooks guilty.”
 

 (Brooks’s reply brief, at pp. 4-5.)
 

 Brooks’s argument is directly contrary to Alabama law, which has consistently held that it is not the province of this Court to reweigh the evidence presented at trial. There is no dispute that the State presented a prima facie case of robbery, and this Court will not review the weight of the evidence or the credibility of the witnesses.
 

 
 *285
 
 Brooks is not entitled to relief on this claim of error.
 

 II.
 

 Although we have determined that Brooks is not entitled to relief on the claim he raised on appeal, this Court has a duty to notice jurisdictional defects.
 
 Williams v. State,
 
 10 So.3d 1083 (Ala.Crim.App.2008). This case presents two such defects.
 

 A. Brooks was erroneously charged in count 3 of the indictment with robbery for the theft of currency belonging to the flower shop and was convicted of that offense. However, robbery is an offense against the person; the victim of a robbery is the person against whom force is used or threatened, even when the property taken belongs to a business.
 
 See, e.g., Abrams v. State,
 
 978 So.2d 794 (Ala.Crim.App.2006), and cases cited therein. Count 1 charged Brooks with theft of currency belonging to Mildred Freeman, while using or threatening to use force against Freeman or another person while being armed with a pistol; count 2 charged Brooks with theft of currency belonging to Tony White, while using or threatening to use force against White or another person while being armed with a pistol; count 3 charged Brooks with theft of currency belonging to Ann’s Flowers and Gifts, while using or threatening to use force against White and/or Freeman or another person while being armed with a pistol. The State cannot convert a single theft of various items of property from one victim into separate offenses because to do so violates the prohibition against double jeopardy; the unit of prosecution is the act of violence against the person.
 
 Craig v. State,
 
 893 So.2d 1250 (Ala.Crim.App.2004) (the fact that the defendant took property from both the clerk and from the dry-cleaning business did not create two separate robbery offenses). Therefore, although Brooks took money belonging to Ann’s Flowers and Gifts, he threatened the use of force against Tony White when he did so. That Brooks also took money from White’s wallet while he threatened the use of force against White did not create a separate incident of robbery. Brooks was twice placed in jeopardy by being indicted for and convicted of those two charges, when he committed only one crime involving White. Therefore, as to the conviction for count 3, we remand this case for the trial court to vacate the conviction.
 

 Count 1 charged the robbery of Mildred Freeman and is a separate crime involving a separate victim; that indictment and conviction do not violate double-jeopardy principles. Count 1 and count 2 were proper charges, and the judgments of conviction on those counts will remain.
 

 B. We must also remand this cause for clarification of the sentence imposed by the trial court. Although Brooks states in his brief that the trial court imposed three concurrent terms of 85 years’ imprisonment, our review of the transcript of the sentence hearing and of the trial court’s sentencing order fails to support that statement. Rather, the trial court appears to have imposed only a general sentence of 85 years’ imprisonment. Accordingly, this case is remanded to the trial court with directions that the trial court: (1) clarify whether it intended to impose the 85-year sentence for each conviction, and, if the sentence was imposed as to only one count, the court must hold a new sentencing hearing and impose a sentence for the second conviction that properly remains; and (2) indicate whether the sentences are to run concurrently or consecutively.
 

 For the foregoing reasons, the judgment as to Brooks’s convictions for the offenses
 
 *286
 
 charged in count 1 and count 2 of the indictment is affirmed. However, we remand the cause for the trial court to set aside the judgment of conviction as to that count. On remand, the trial court is further ordered to clarify the sentence imposed as to counts 1 and 2, as directed above. The trial court shall take all necessary action to see that the circuit clerk makes due return to this Court at the earliest possible time and within 28 days after the release of this opinion. The remand shall include a transcript of the new sentencing hearing, if one is required.
 

 AFFIRMED IN PART; REMANDED WITH INSTRUCTIONS.
 
 *
 

 WINDOM, KELLUM, BURKE, and JOINER, JJ., concur.
 

 [1]
 

 . The trial court sentenced Brooks pursuant to the voluntary sentencing standards. § 12-25-31
 
 etseq.,
 
 Ala.Code 1975.
 

 [2]
 

 . The witness’s name is spelled both "Robyn” and "Robin” in the transcript.
 

 *
 

 Note from the reporter of decisions: On July 15, 2011, on return to remand, the Court of Criminal Appeals affirmed, without opinion.