Rel: February 9, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2023-2024

_____

### CR-2022-0934

_____

### Jeffery Bernard Harris

### v.

### State of Alabama

### Appeal from Dallas Circuit Court
### (CC-18-148)

McCOOL, Judge.

Jeffery Bernard Harris appeals his convictions for attempted murder, see § 13A-4-2 and § 13A-6-2, Ala. Code 1975, and discharging a firearm into an occupied automobile, see § 13A-11-61, Ala. Code 1975.

The trial court sentenced Harris, as a habitual felony offender, to life imprisonment without the possibility of parole.

Facts and Procedural History

On August 9, 2017, Arvid Coleman, Quintan Davis, and a man identified at trial only as Owens were driving in Selma when their car broke down near a mobile-home park. Coleman knew a woman, Dinah Agee, who lived in the park, so he went to her mobile home to ask for some water. At that time, Harris and Agee were involved in a romantic relationship, and Harris was outside working on Agee's car when Coleman approached her mobile home. According to Coleman, while he was getting water from an outside spigot, Harris approached him and wanted to know how he knew Agee. Coleman testified that he "felt something wasn't right" with Harris's demeanor, so he tried to "ease on back and get on in the car and get out of the way." (R. 102.) However, according to Coleman, Harris "started hitting [him] upside the head with his fist" and then "started hitting [him] on the other side of [his] head with [a] gun." (Id.) Regarding what occurred next, Coleman testified:

> "Q. Did you see other people out there that day?
>
> "A. Yes, there were other people out there, children and a couple other people was out there. So the first thing I could

think of to save my life and not to put anybody else in danger was, I made the decision to fall back in the car. And I told [Owens], I said, 'Man, just pull off.'

"....

"Q. And where did you sit in the car?

"A. In the passenger's seat.

"Q. Okay.

"A. And I said, 'Pull off, man.' I said, 'Just go on and pull off. He got that gun.' I said, 'Just go on and pull off.' So we went through the back part of the [mobile-home] park. There was no, really, way to get out. But somehow, Mr. Owens maneuvered through some pipes and stuff and he got out to the other side, like, the U-part of the [mobile-home] park. So as we were going around, [Harris] started shooting – when we started pulling out, he started shooting at the car. So Mr. Owens made a quick right turn, and he maneuvered through the back of the [mobile-home] park somehow, and we got out to the other side of the road. And when we got around the other side, headed back towards the front part of the [mobile-home] park, here comes Mr. Harris running, shooting the gun right there. And he stood there and dumped that gun – all those bullets almost into that car. Everybody ducked in the car. I even ducked. But when I raised up, another bullet had caught me and hit me in my face right here (indicating).

"Q. How close was Mr. Harris to you-all in the car?

"A. I'd say about 20 feet, 30 feet maybe.

"....

"Q. Now, when you were being shot at, did you see Mr. Harris shooting?

3

"A. I did.

"....

"Q. Now, you said as soon as you-all were pulling off, he started shooting, correct?

"A. Yes, he did.

"Q. Now, was it a continuous shooting, and he just kept shooting as you-all were driving?

"A. I actually couldn't tell because I was ducked down and we was trying to get out of there. But I know a couple bullets hit that car I don't know how many times he shot while we was trying to get away. But I know when we got free, it's like he just couldn't let it go. He just kept coming for some reason. So he ran to the front and started shooting again. And that's when I got hit."

(R. 103-09.) When an evidence technician with the Selma Police Department inspected the car that Owens drove from the scene, she found two bullet holes – one "in the trunk above the tail light and one … in the front windshield." (R. 73.)

Det. Devan McGuire of the Selma Police Department responded to the shooting, and, when he arrived at the scene, Harris and Lakeshia Prince were present. According to Det. McGuire, Prince told him "that she just witnessed Jeffery Harris shoot some guys or shoot into a vehicle," and Det. McGuire took Harris into custody. (R. 53.) Harris was then

4

taken to the Selma Police Department for questioning, and the shirt he was wearing, which contained blood spatter, was collected for evidence.

The State attempted to present testimony from Joseph Lee, a forensic scientist with the Alabama Department of Forensic Sciences, regarding a DNA analysis he had conducted on the blood found on Harris's shirt. Defense counsel objected to Lee's testimony on the basis that he had not received "any notice of [Lee] to testify" and that the discovery he had been provided did not include Lee's "analysis of the shirt." (R. 89.) The trial court then told the State: "I'll tell you what, if [defense counsel] doesn't have [Lee's report], you can't use it. That's the bottom line." (R. 91.) The State then asked the trial court if the parties could have a moment to "go through [the discovery] file" (id.) to make certain that Lee's report was not in the file, at which point the following colloquy occurred:

> "THE COURT: … [L]et me make it clear for the record. Now, it was brought to my attention just now [that Harris] said he did not have the report that this witness purports to testify to. Now, if [Harris] does not have this discovery, it can't be used. Now, you-all asked for a minute to go through his file and see what discovery he had. You-all do that and report back to me and see what y'all find. But we've got to be sure discovery is done properly. The rules say you're supposed to get it within 14 days after it's requested or after I order it.

5

And so this is going to have to stop, period. So you all go through and see. …

"[THE STATE]: Yes, Your Honor. And may I say for the record, the State has not excluded anything intentionally or purposefully. As stated, I have checked twice before to see if [defense counsel] had everything. There should at least be a mention that there was DNA analysis. At no time have they notified us [that they did not] have a DNA analysis report.

"THE COURT: … I trust you, I believe in you, I count on you. And because I have faith in you that there was nothing intentionally done, I'm not going to dismiss this case. See, if I thought there was something intentionally being done, there was some prosecutorial misconduct, I'd dismiss this case. But I'm not going to dismiss the case. I'm just going to prohibit anything [Harris] doesn't have. They have to have notice. If not, the appellate court is going to throw this case back at me and make me have to do it again. I'm not doing all that. I'm doing these cases one time. That's the bottom line.

"[DEFENSE COUNSEL]: Judge, in all fairness, we have a lot of discovery here. It may be an oversight. I don't know.

"THE COURT: If it's an oversight, it's an oversight. That's the point. I'm not going to dismiss the case; it's an oversight.

"[DEFENSE COUNSEL]: Thank you, Judge.

"….

"THE COURT: Now, you all report to me and let me know what you all find with this discovery issue.

"[THE STATE]: Your Honor, it does not appear to be in [the] file [defense counsel] has with him today.

"THE COURT: Then it's going to be excluded from use here in this trial.  That's just the bottom line."

(R. 92-95.)

Harris testified as follows regarding the event in question:

"Q. Would you please tell us in your words what happened?

"....

"A. So … while I was [working on Agee's car], Mr. Coleman and two other guys, they pulled up beside the street, right by the house, but, you know, they was on the shoulder of the road.  So [Coleman] walked up in the yard, and he spoke to [Agee], and he said that he hadn't came by and seen her in a while because he had went to Mobile to check on his daughter or somebody, and then he asked her for water.  So when he asked her for water – so I thought to myself, I said, well, this must be the guy that everybody was telling me about that was hanging around over here.  So he get the water and he go back to the car, and he put that jug of water in there, and then he came back up in the yard as I was still right beside the mobile home, you know, tending to the car.  So I heard [Agee] tell him just get that water and go.  So he walked up beside the mobile home near where I was working on the car at, and he went to the water faucet there, and he filled the jug up again.  So I told him, I said, 'Hey, man,' I said, 'She told you to leave.'  I said, 'You came here the other night, and I was in the shower, and she told you to leave and not to come back.  But … you're still coming back around here.'  So then he turned to me and said who the F am I?  So I said, 'I stay here.'  So he approached me, and I shoved him, and he stumbled back.  And he kind of rushed me, and I flipped him to the ground.  After that, I noticed that the two guys that were with him, they closed the hood and went to break towards the car.

7

So when they broke towards the car he got off the ground and he went to running out towards the car, and they left.

"Q. With that in mind, Mr. Harris, when did you pull out a gun and shoot him?

"A. I never had a gun.

"....

"Q. Did you see two more people in his car?

"A. I seen a white guy that was driving, and I seen a guy in the back with dreadlocks. And from my indication, when I heard shots, I fell back behind Agee's car. I'm not trying to see who's shooting. You know, from where I'm from – I'm from the slums, I'm from the hood. If anybody's shooting, you're trying to run and get down.

"....

"Q. So … if I understand correctly, you do recall gunshots being fired?

"A. Yes, sir.

"Q. And you didn't fire them?

"A. No, sir.

"Q. So if you didn't fire them, as circumstantial evidence indicated, they would be coming from where? Do you know?

"A. Evidently, it had to have been coming from the car."

(R. 165-80.) Agee likewise testified that Harris had attempted to make Coleman leave her property but that he had not shot at Coleman.

8

Discussion

Harris raises two claims on appeal that, he says, entitle him to relief from his convictions. We address those claims in turn.

I.

Harris argues that the trial court erred by denying his motion for a judgment of acquittal because, he says, the State's evidence was not sufficient to sustain his convictions for attempted murder and discharging a firearm into an occupied automobile.

> "'"In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution."' Ballenger v. State, 720 So. 2d 1033, 1034 (Ala. Crim. App. 1998) (quoting Faircloth v. State, 471 So. 2d 485, 488 (Ala. Crim. App. 1984), aff'd, 471 So. 2d 493 (Ala. 1985)). '"The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt."' Nunn v. State, 697 So. 2d 497, 498 (Ala. Crim. App. 1997) (quoting O'Neal v. State, 602 So. 2d 462, 464 (Ala. Crim. App. 1992)). '"When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision."' Farrior v. State, 728 So. 2d 691, 696 (Ala. Crim. App. 1998) (quoting Ward v. State, 557 So. 2d 848, 850 (Ala. Crim. App. 1990)). 'The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow

submission of an issue for decision [by] the jury.' Ex parte Bankston, 358 So. 2d 1040, 1042 (Ala. 1978)."

Wilson v. State, 142 So. 3d 732, 809 (Ala. Crim. App. 2010).

Section 13A-4-2(a) provides that "[a] person is guilty of an attempt to commit a crime if, with the intent to commit a specific offense, he or she does any overt act towards the commission of the offense." Section 13A-6-2(a)(1) provides that a person commits the crime of murder if, "[w]ith intent to cause the death of another person, he or she causes the death of that person or of another person."

Section 13A-11-61(a) provides that "[n]o person shall shoot or discharge a firearm, explosive or other weapon which discharges a dangerous projectile into any occupied or unoccupied dwelling or building or railroad locomotive or railroad car, aircraft, automobile, truck or watercraft in this state."

In this case, Coleman testified that Harris shot at him while he (Coleman) was inside an automobile, and Harris's intent to kill could be inferred from his use of a deadly weapon. Henderson v. State, 248 So. 3d 992, 1007 (Ala. Crim. App. 2017). Thus, Coleman's testimony was sufficient to prove beyond a reasonable doubt that Harris committed the crimes of attempted murder and discharging a firearm into an occupied

10

automobile. Accordingly, the trial court did not err by denying Harris's motion for a judgment of acquittal and submitting the case to the jury. See Christianson v. State, 601 So. 2d 512, 520 (Ala. Crim. App. 1992) (holding that the "victim's testimony … was alone sufficient to establish a prima facie case of … attempted murder"), overruled on other grounds by Ex parte Thomas, 649 So. 2d 3 (Ala. 1994); Rowell v. State, 647 So. 2d 67, 69 (Ala. Crim. App. 1994) (holding that the evidence was sufficient to sustain the defendant's conviction for attempted murder because the victim "positively identified the [defendant] as the person who shot him," which "alone established a prima facie case of attempted murder"); and Woods v. State, 845 So. 2d 843, 846 (Ala. Crim. App. 2002) (holding that the evidence was sufficient to sustain the defendant's conviction for discharging a firearm into an occupied automobile because the occupants of the automobile testified that the defendant had shot at them while they were inside the automobile).

We acknowledge Harris's arguments that there was no physical evidence linking him to the crimes, that Coleman's testimony was uncorroborated, and that his own testimony indicated that he had not committed the crimes. However, these arguments go to the weight of the

11

evidence, not its sufficiency. See Thomas v. State, 622 So. 2d 415, 419 (Ala. Crim. App. 1992) (holding that there was sufficient evidence to sustain the appellant's convictions, "[d]espite the fact that there was no physical evidence linking the appellant to the commission of the crime"); and Adams v. State, 336 So. 3d 673, 686 (Ala. Crim. App. 2020) (" 'Matters of the credibility of witnesses and any apparent conflicts in the evidence go to the weight of the evidence and not to the sufficiency.'" (quoting Pettway v. State, 624 So. 2d 696, 698 (Ala. Crim. App. 1993))).

To the extent Harris has challenged the weight of the evidence, that claim is without merit. In Thompson v. State, 97 So. 3d 800, 810 (Ala. Crim. App. 2011), this Court stated:

> "'"We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial. '"The credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine."'"'
>
> "Seaton v. State, 645 So. 2d 341, 342-43 (Ala. Crim. App. 1994), quoting Johnson v. State, 555 So.2d 818, 819-20 (Ala. Crim. App. 1989) (citations omitted).
>
> "'Once a prima facie case has been submitted to the jury, this Court will not upset the jury's verdict except in extreme situations in which it is clear from the record that the evidence against the accused was so lacking as to make the verdict wrong and unjust. Deutcsh v. State, 610 So. 2d

12

1212, 1234-35 (Ala. Cr. App. 1992). This Court will not substitute itself for the jury in determining the weight and probative force of the evidence. <u>Benton v. State</u>, 536 So. 2d 162, 165 (Ala. Cr. App. 1988).'

"<u>May v. State</u>, 710 So. 2d 1362, 1372 (Ala. Crim. App. 1997).

"'Furthermore, on appeal, there is a presumption in favor of the correctness of the jury verdict. <u>Saffold v. State</u>, 494 So. 2d 164 (Ala. Cr. App. 1986). Although that presumption of correctness is strong, it may be overcome in a limited category of cases where the verdict is found to be palpably wrong or contrary to the great weight of the evidence. <u>Bell v. State</u>, 461 So. 2d 855, 865 (Ala. Cr. App. 1984).'

"<u>Henderson v. State</u>, 584 So. 2d 841, 851 (Ala. Crim. App. 1988)."

In this case, Coleman's testimony implicated Harris in the crimes, and, contrary to Harris's contention, Coleman's testimony was corroborated by Prince, who told Det. McGuire that Harris had committed the crimes. On the other hand, Harris denied committing the crimes, and his testimony was corroborated by Agee. Thus, this case is far from being in the "limited category of cases" in which "the evidence against the accused was so lacking as to make the verdict wrong and unjust." <u>Thompson</u>, 97 So. 3d at 810 (citations omitted). Rather, this case presents a textbook example of conflicting evidence that the jury was

13

tasked with resolving based on its credibility determinations. Accordingly, Harris is not entitled to relief on this claim.

## II.

Harris argues that the trial court erred by not dismissing the case with prejudice after the court was made aware that the discovery the State provided to him did not include the DNA analysis of the blood on his shirt. However, Harris never asked the trial court to dismiss the case, nor did he object when the trial court stated of its own accord that it was not going to dismiss the case. It is well settled that "a trial court '"will not be put in error on grounds not assigned at trial."'" Anderson v. State, 360 So. 3d 1117, 1123 (Ala. Crim. App. 2020) (quoting Ex parte Coulliette, 857 So. 2d 793, 794 (Ala. 2003), quoting in turn Ex parte Frith, 526 So. 2d 880, 882 (Ala. 1987))). Thus, Harris cannot obtain relief on this claim.

Moreover, in arguing that dismissal was warranted, Harris alleges that "the State committed prosecutorial misconduct so egregious that it denied [him] his constitutional right to a fair trial." (Harris's brief, p. 16.) However, as a sanction for the State's discovery violation, the trial court excluded the DNA analysis from evidence, which it was authorized to do by Rule 16.5, Ala. R. Crim. P. Thus, the trial court protected Harris's

14

right to a fair trial and, in doing so, did not impose a harsher sanction than was necessary. As the Alabama Supreme Court has explained, "a trial court has broad discretion in imposing sanctions on a party who fails to comply with the trial court's discovery order," and that sanction "should not be harsher than necessary to satisfy the discovery rules." State v. Fowler, 32 So. 3d 21, 29 (Ala. 2009). Accordingly, for this reason as well, Harris is not entitled to relief on this claim.

## III.

Although Harris is not entitled to relief from his convictions, we must remand this case for the trial court to correct a sentencing error. Neither party raises any issue with respect to Harris's sentences, but "'[m]atters concerning unauthorized sentences are jurisdictional,' Hunt v. State, 659 So. 2d 998, 999 (Ala. Crim. App. 1994); therefore, we may take notice of an illegal sentence at any time." Austin v. State, 864 So. 2d 1115, 1117 (Ala. Crim. App. 2003).

Harris was sentenced under the Habitual Felony Offender Act ("the HFOA"), see § 13A-5-9, Ala. Code 1975, based on his four prior felony convictions, one of which was for a Class A felony. (R. 291.) The HFOA states, in relevant part:

"(c) In all cases when it is shown that a criminal defendant has been previously convicted of any three felonies that are Class A, Class B, or Class C felonies and after such convictions has committed another Class A, Class B, or Class C felony, he or she must be punished as follows:

"....

"(2) On conviction of a Class B felony, he or she must be punished by imprisonment for life or any term of not less than 20 years.

"(3) On conviction of a Class A felony, where the defendant has no prior convictions for any Class A felony, he or she must be punished by imprisonment for life or life without the possibility of parole, in the discretion of the trial court.

"(4) On conviction of a Class A felony, where the defendant has one or more prior convictions for any Class A felony, he or she must be punished by imprisonment for life without the possibility of parole."

The sentencing order indicates that the trial court sentenced Harris to life imprisonment without the possibility of parole for both his attempted-murder conviction and his discharging-a-firearm-into-an-occupied-automobile conviction. (C. 109.) Attempted murder is a Class A felony, see § 13A-4-2(d)(1); thus, pursuant to § 13A-5-9(c)(4), the only sentence the trial court could impose for Harris's conviction for that offense was life imprisonment without the possibility of parole. However,

16

discharging a firearm into an occupied automobile is a Class B felony, see §13A-11-61(b); thus, pursuant to § 13A-5-9(c)(2), the sentencing range for Harris's conviction for that offense was "imprisonment for life or any term of not less than 20 years." Consequently, for that conviction, Harris's sentence of life imprisonment without the possibility of parole is illegal. See Glass v. State, 14 So. 3d 188, 194 (Ala. Crim. App. 2008) (noting that a sentence "outside the limit provided by statute" is an illegal sentence). We therefore reverse Harris's sentence for his discharging-a-firearm-into-an-occupied-automobile conviction and remand the case for the trial court to conduct a new sentencing hearing at which the court imposes a sentence for that conviction that complies with § 13A-5-9(c)(2). The trial court shall take all necessary action to ensure that the circuit clerk makes due return to this Court within 35 days of the date of this opinion, and the return to remand shall include a transcript of the sentencing hearing and the court's written sentencing order.

## Conclusion

For the reasons set forth in this opinion, Harris's convictions are affirmed, as is his sentence for his attempted-murder conviction. However, we reverse Harris's sentence for his discharging-a-firearm-

17

into-an-occupied-automobile conviction and remand the case for the trial court to hold a new sentencing hearing at which it imposes a legal sentence for that conviction.

AFFIRMED AS TO CONVICTIONS; AFFIRMED IN PART AND REVERSED IN PART AS TO SENTENCES; AND REMANDED WITH INSTRUCTIONS.

Windom, P.J., and Kellum, Cole, and Minor, JJ., concur.