Rel: March 28, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2024-2025

————————————————

## CR-2024-0329

————————————————

## K.A.

### v.

### State of Alabama

### Appeal from Russell Juvenile Court
### (JU-23-748.03)

KELLUM, Judge.

K.A. was adjudicated delinquent on the underlying charge of murder made capital because it was committed during the course of a

robbery in the first degree.[1]  See § 13A-5-40(a)(2), Ala. Code 1975.  The juvenile court found K.A. to be a serious juvenile offender and committed him to the custody of the Department of Youth Services ("DYS") until his 21st birthday.

At the delinquency hearing, the State presented evidence indicating that, on December 12, 2023, K.A. and J.S. robbed at gunpoint Douglas Rutledge as he was walking down the street by Synovus Bank in Phenix City.  One pointed the gun at Rutledge while the other checked Rutledge's pockets.  K.A. and J.S. then ran away, and Rutledge continued walking.  A short time later, a little after 7:00 p.m., just after Ryan Boles got into his vehicle parked behind Synovus Bank, K.A. ran up, opened the driver's door, and shot Boles.  The autopsy revealed that the bullet

---

[1]In the same proceeding, in case no. JU-23-748.04, K.A. was tried for a robbery that occurred only a few minutes before the murder, and the juvenile court purported to adjudicate him delinquent of attempted robbery as a lesser-included offense of the robbery charge.  See, e.g., Pilgrim v. State, 963 So. 2d 697, 700 (Ala. Crim. App. 2006) ("[A]fter the effective date of the Criminal Code [January 1, 1980,] attempted robbery [i]s no longer a criminal offense in Alabama.").  K.A. listed on his notice of appeal, however, only case no. JU-23-748.03, the case number associated with his adjudication for capital murder.  Therefore, this appeal is solely from his adjudication for capital murder.

passed through Boles's left arm and entered his chest, where it punctured his heart, lung, diaphragm, and liver.

Surveillance cameras from the bank and another nearby business captured both the robbery of Rutledge and the murder of Boles. K.A. was identified from that surveillance footage as one of the participants in the crimes based on the distinctive clothing that he was wearing at the time[2] and based on Robert Isabel, a lieutenant with the Phenix City Police Department, recognizing K.A., whom he knew personally. Specifically, testimony indicated that K.A. had received the Reebok brand black and gray jacket and the joggers with writing down the side that he was wearing the night of the shooting only a few days earlier as Christmas presents from a youth camp that he regularly attended and where Lt. Isabel volunteered. K.A. later gave a statement to investigators, in which he confessed to shooting Boles, claiming that the gun belonged to J.S. and that, "if he didn't do what he did, then [J.S.] was going to kill him that night." (R. 387.)

I.

---

[2]J.S. was also identified based on his clothing as seen in the surveillance footage.

K.A. contends that the juvenile court erred in denying his motion to suppress the statement he made to investigators because, he says, he did not knowingly and voluntarily waive his rights. He argues that he was only 13 years old, had completed only the 6th grade, and had not taken any classes in school about his constitutional rights. He also argues that he did not verbally acknowledge that he understood his rights during the interview and that his aunt testified that she did not believe he understood his rights. Thus, he concludes, he was too young and lacking in knowledge to knowingly and voluntarily waive his rights.

At the suppression hearing and at the delinquency hearing, the State presented evidence indicating that Lt. Isabel and Deon San Nicolas, an investigator with the Phenix City Police Department, interviewed K.A. Inv. San Nicolas advised K.A. of his juvenile Miranda rights.[3] Inv. San Nicolas said that, when asked if he understood his rights, K.A. nodded his head and then signed a waiver-of-rights form.[4]

---

[3]See Miranda v. Arizona, 384 U.S. 436 (1966), and § 12-15-202, Ala. Code 1975.

[4]After watching the video of the interview, the juvenile court agreed that K.A. had nodded his head, albeit slightly, after being asked if he understood his rights. This Court has also watched the video, and we agree with the juvenile court.

4

According to Inv. San Nicolas, K.A. appeared to understand his rights and never indicated otherwise and at no point during the interview did K.A. refuse to answer questions or request to speak to a lawyer or a parent. In addition, Inv. San Nicolas stated that no promises or threats were made to induce K.A. to give a statement.

Rayshawnda Hicks, K.A.'s aunt, testified at the suppression hearing that K.A. had lived with her from the fourth grade to the sixth grade, which concluded in May before the murder in December 2023. Hicks testified that she did not remember K.A.'s having taken any classes in which he learned about government or the United States Constitution. She also testified that she had had no discussions with K.A. about his constitutional rights, and, because of that, she did not "think he would understand or he understood" his constitutional rights. (R. 45.) Hicks admitted, however, that K.A. understood the English language and that he had no trouble understanding her when she spoke to him.

> "To establish a proper Miranda predicate, the State must prove that 'the accused was informed of his Miranda rights before he made the statement' and that 'the accused voluntarily and knowingly waived his Miranda rights before making his statement.' Jones v. State, 987 So. 2d 1156, 1164 (Ala. Crim. App. 2006). 'Whether a waiver of Miranda rights is voluntarily, knowingly, and intelligently made depends on the facts of each case, considering the totality of the

5

circumstances surrounding the interrogation, including the characteristics of the accused, the conditions of the interrogation, and the conduct of the law-enforcement officials in conducting the interrogation.' Foldi v. State, 861 So. 2d 414, 421 (Ala. Crim. App. 2002)."

Wilkerson v. State, 70 So. 3d 442, 460 (Ala. Crim. App. 2011).

The evidence established that K.A. was properly advised of his juvenile Miranda rights, that he nodded his head when asked if he understood those rights, that he signed a waiver-of-rights form, and that no threats or promises were made to get K.A. to waive his rights or to give his statement. At no time did K.A. indicate that he did not understand his rights as read to him, and, after a time, he answered the questions posed to him.[5] In State v. R.C., 195 So. 3d 317, 323-24 (Ala. Crim. App. 2015), this Court held that a juvenile's "affirmative nodding of his head [when asked if he understood his rights] as well as his signature at the bottom of the waiver form ... indicate that [the juvenile] was aware of his rights but chose to waive them." Although K.A.'s aunt testified that she did not believe K.A. was able to understand his rights, her opinion in that regard was based on her not having any conversations

---

[5]K.A. did not respond to the questions posed to him during the first few minutes of the interview.

6

with K.A. about his rights, and she admitted that K.A. understood English and had no trouble understanding her when she spoke with him about other things. Neither K.A.'s age nor the fact that he had not been schooled in his constitutional rights by someone other than law-enforcement officers indicates that K.A. was unable to, or did not, understand his rights. Under the circumstances in this case, we have no trouble concluding that K.A. knowingly and voluntarily waived his juvenile <u>Miranda</u> rights. Therefore, the juvenile court properly denied K.A.'s motion to suppress.

## II.

K.A. also contends that the juvenile court erred in ordering that he be committed to DYS until his 21st birthday, because, he says, subsections (b), (c), and (d) of § 12-15-219, Ala. Code 1975, part of the Juvenile Justice Act, § 12-15-101 et. seq., Ala. Code 1975, when strictly construed and read <u>in pari materia</u>, prohibit a juvenile court from committing a serious juvenile offender to the custody of DYS for more than one year. Whether the juvenile remains in the custody of DYS for more than one year, he maintains, is to be determined by DYS, not the juvenile court. Relying on <u>Ex parte S.F.R.</u>, 598 So. 2d 1006 (Ala. 1992),

7

he argues that, to hold otherwise would allow the juvenile court to dictate the "amount of time that a juvenile must remain in the custody of DYS" and would, therefore, "undermine[] the express authority of DYS to determine when a juvenile has achieved rehabilitation." (K.A.'s brief, p. 21.)

The State argues, on the other hand, that in Ex parte R.E.C., 678 So. 2d 1041, 1045 (Ala. 1995), the Alabama Supreme Court held that a determinate commitment was permissible under the Juvenile Justice Act even for a nonserious juvenile offender as long as the juvenile court made certain findings. According to the State:

> "[I]f the less serious offenders can be subject to determinate periods of commitment, serious juvenile offenders can as well. A conclusion otherwise would result in absurd results, wherein a juvenile charged with second-degree assault could be committed for a determinate period of time, while a juvenile that commits capital murder cannot."

(State's brief, pp. 28-29.) The State suggests that this Court apply the rationale and holding of Ex parte R.E.C. to serious juvenile offenders and that we remand this case for the juvenile court to make the findings required by Ex parte R.E.C. We agree with the State.

Initially, we decline K.A.'s request to strictly construe the provisions of § 12-15-219. This Court is required to liberally, not strictly,

8

construe the Juvenile Justice Act. See § 12-15-101(d), Ala. Code 1975 ("This chapter shall be liberally construed to the end that each child coming under the jurisdiction of the juvenile court shall receive the care, guidance, and control, preferably in his or her own home, necessary for the welfare of the child and the best interests of the state."). See also Ex parte R.E.C., 678 So. 2d at 1044 (noting that a "narrow construction" of the Juvenile Justice Act "is inconsistent with [the] legislative directive"). That being said, we reject K.A.'s argument that the provisions of § 12-15-219 prohibit a juvenile court from committing a serious juvenile offender to the custody of DYS for more than one year.

Section 12-15-219(b) provides that "[a] child found to be a serious juvenile offender shall be committed to the custody of the Department of Youth Services, where he or she shall remain for a minimum of one year." (Emphasis added.) The plain language of this subsection establishes a minimum term of commitment, not a maximum. Sections 12-15-219(c) and (d) then provide:

> "(c) A serious juvenile offender review panel shall be created by the Board of the Department of Youth Services. The serious juvenile offender review panel shall review quarterly the progress of each serious juvenile offender and determine at the end of the one-year term served by each child, a further treatment plan for that child. The panel may

9

extend the commitment, order alternative treatment, or release the child. The serious juvenile offender review panel shall provide the juvenile court with all reports and recommendations, and notify the judge in writing of the decision to release the child at least 30 days in advance of the release.

"(d) The Department of Youth Services shall maintain and staff a separate, secure facility and implement programs for serious juvenile offenders. The minimum one-year term required by this section shall be served at the facility and the review panel may extend the period of confinement in the facility as determined necessary."

In Ex parte S.F.R., on which K.A. relies, the Alabama Supreme Court held that a serious juvenile offender is not entitled to credit for time served in detention pending his or her delinquency hearing. The Court noted three reasons for its holding, only the first of which is relevant here:

"First, for this Court to hold that serious juvenile offenders must receive credit for time served would undercut the very purposes and stated goals of the Juvenile Justice Act. The purposes of the Juvenile Justice Act are 'to facilitate the care, protection and discipline of children who come within the jurisdiction of the juvenile court, while acknowledging the responsibility of the juvenile court to preserve the public peace and security.' Section 12-15-1.1, Ala. Code 1975 [now § 12-15-101(a), Ala. Code 1975]. Additionally, a stated goal of the Juvenile Justice Act is:

"'To hold a child found to be delinquent accountable for his or her actions to the extent of the child's age, education, mental and physical

10

condition, background and all other relevant factors and to provide a program of supervision, care, and rehabilitation, including rehabilitative restitution by the child to the victim of his delinquent acts to the extent that the child is reasonably able to do so.'

"§ 12-15-1.1(7), Ala. Code 1975 [now § 12-15-101(b)(7), Ala. Code 1975].

"Clearly, the intent of the Juvenile Justice Act is not punitive but rehabilitative. For this Court to hold that a serious juvenile offender <u>must</u> receive credit for time spent in pre-adjudication detention would be to dictate to the Department of Youth Services when rehabilitation is achieved. Also, such a holding would undermine the juvenile court's ability 'to preserve the public peace and security' by forcing a release of a youth who, in the professional opinion of DYS officials, might not be fully rehabilitated."

598 So. 2d at 1008.

K.A.'s argument focuses on the Court's reasoning that allowing credit for preadjudication detention would improperly dictate to DYS when rehabilitation has been achieved, without acknowledging the additional reason the Court provided for not allowing credit for preadjudication detention -- that it would undermine the juvenile court's ability to preserve the public peace and security. In other words, K.A.'s argument focuses entirely on the rehabilitative purpose of the Juvenile

11

Justice Act. But as the Alabama Supreme Court subsequently recognized in Ex parte R.E.C., the purpose of the Act is, in fact, two-fold:

"We agree that the Act aims to rehabilitate, but we assign particular significance to its two-fold statement of purpose, one of which 'is to facilitate the care, protection and discipline of children who come within the jurisdiction of the juvenile court.' Section 12-15-1.1 [now § 12-15-101(a), Ala. Code 1975] (emphasis added). '"Discipline" (as a noun) signifies "punishment; ... retribution for an offense, especially in a subordinate; ... control gained by enforcing obedience or order." As a verb, it means "to chastise, to impose a penalty upon."' Federal Labor Union 23393, American Federation of Labor v. American Can Co., 28 N.J. Super. 306, 100 A.2d 693, 695 (1953) (quoting Webster's New International Dictionary (2d ed.)). Moreover, rehabilitation is one of the goals of punishment. Williams v. State, 420 So. 2d 91 (Ala. Crim. App. 1982) (quoting Castle v. United States, 399 F.2d 642, 652 (5th Cir. 1968)). To effectuate this goal, the legislature expressly authorized the juvenile court '[t]o hold a child found to be delinquent accountable for his or her actions to the extent of the child's age, ... background and all other relevant factors and to provide a program of supervision, care, and rehabilitation, including rehabilitative restitution by the child to the victim of [the child's] delinquent acts.' Section 12-15-1.1(7) [now § 12-15-101(b)(7), Ala. Code 1975] (emphasis added). Indeed, the Act uses such 'rehabilitative' terms virtually interchangeably with 'punitive' or 'disciplinary' terms. We conclude, therefore, that the legislature did not intend to restrict the juvenile court exclusively to courses of action devoid of an arguably punitive flavor."

678 So. 2d at 1043.

In Ex parte R.E.C., the Alabama Supreme Court addressed an argument similar to the argument K.A. makes here. The juvenile court

there had committed the juvenile, who was not found to be a serious juvenile offender, to the custody of DYS for a determinate period. The juvenile argued that such a "determinate commitment impinges upon the prerogative of DYS to decide when rehabilitation has been achieved." 678 So. 2d at 1043. In support of his argument, the juvenile relied in large part on § 44-1-36(c), Ala. Code 1975, which provides that "[a] committed youth shall be discharged who, in the judgment of the director [of DYS], has gained optimal rehabilitation from the programs of the department and will not be received again by the department under the original commitment order." Section § 12-15-219 is similar to § 44-1-36 in that both statutes appear to place the determination of when a juvenile has been rehabilitated and is entitled to be released in the hands of DYS.

The Alabama Supreme Court rejected the juvenile's argument, holding that a determinate commitment was permissible under the Juvenile Justice Act. The Court reasoned:

> "We agree that the Juvenile Justice Act cannot be construed without reference to § 44-1-36(c) and the rest of Title 44, Chapter One. See Locke v. Wheat, 350 So. 2d 451, 453 (Ala. 1977) ('Sections of the Code dealing with the same subject matter are in pari materia'). However, even a cursory reading of Title 44, Chapter One, compels the conclusion that the legislature intended DYS and the juvenile court to operate in coordination and concert.

"For example, the purpose of Title 44, Chapter One -- the chapter creating DYS -- is 'to promote and safeguard the social well-being and general welfare of the youth of the state through a comprehensive and <u>coordinated</u> program of public services for the prevention of juvenile delinquency and the <u>rehabilitation</u> of delinquent youth.' Section 44-1-1 (emphasis added). One of the means by which the legislature sought to achieve its declared purpose was the development of '[s]ocial and educational services and facilities for any youth whom <u>a juvenile judge</u> deems in need of such state services.' Section 44-1-1(1) (emphasis added). See, e.g., § 44-1-1(5) (a goal of Chapter One is '[t]he promotion of improved communications between the ... agencies and bodies of this state responsible for said youth and the juvenile courts'); § 44-1-30 (requiring DYS to investigate and evaluate each youth committed by the juvenile court to its custody and 'make available its findings ... to any juvenile court in the state'); § 44-1-32 (requiring DYS to apprise the 'committing court ... of the physical location of the youth at all times'); § 44-1-33(a) (requiring DYS to obtain approval for 'major surgery or medical treatment' from the youth's parent or guardian or, if such approval cannot be acquired, from the juvenile court); § 44-1-34 (requiring DYS to submit 'at least every nine months' to the committing court a 'written report,' based on a review of 'all pertinent circumstances of [the] personal and family situation [of each committed youth],' such review to 'be for the purpose of determining whether existing decisions, orders and dispositions in his case should be modified or continued in force').

"Particularly pertinent in this regard are various provisions in § 44-1-36. Pursuant to § 44-1-36(d), for example, '[a] committed youth shall be released into aftercare when [DYS] determines that said youth is no longer in need of the services of the state training schools and can function ... under the supervision of a probation officer in accordance with terms and conditions as established by the committing court.'

14

Pursuant to § 44-1-36(g) -- subject to specific procedural restrictions -- the juvenile court has 'jurisdiction until the youth reaches his twenty-first birthday to <u>issue an extension of its original commitment order</u>.' (Emphasis added.)

"We cite these provisions, of course, primarily as illustrating a principle, namely, that the juvenile court's direct, ongoing participation in the rehabilitation of a delinquent juvenile does not necessarily conflict with the statutory scheme or infringe upon the prerogative of DYS. In fact, the State and both <u>amici</u> agree with this principle.

"Significant also in this connection is the second prong of the stated purpose of the Juvenile Justice Act, which recognizes that it is 'the responsibility of <u>the juvenile court</u> to preserve the public peace and security.' Section 12-15-1.1 [now § 12-15-101(a), Ala. Code 1975] (emphasis added). No one in this case contends that the juvenile court's authority to order a determinate commitment would not facilitate this goal. Logic and experience suggest that such authority would, indeed, promote public safety.[6]

"Finally, the Act contains other intrinsic evidence that is, perhaps, most important to the proper construction of the scope of the juvenile court's discretion. Section 12-15-1.1 [now § 12-15-101(d), Ala. Code 1975] provides: 'This chapter shall be liberally construed to the end that each child coming within the jurisdiction of the juvenile court shall receive such care, guidance and control ... necessary for the child's welfare and the best interest of the state.' R.E.C.'s restrictive view of the juvenile court's role vis-à-vis that of DYS is a result of his <u>narrow</u> construction of the Act, and that view is inconsistent with this legislative directive.

---

[6]This is especially true in cases involving serious juvenile offenders.

15

"Consistent with this directive, however, is a construction of the Act -- and § 12-15-71(c) [now § 12-15-215(a), Ala. Code 1975] in particular -- that vests the juvenile court with broad discretion in the exercise of its continuing jurisdiction of juveniles adjudicated delinquent.[7] Thus, we conclude that, provided certain criteria are met, a determinate commitment is appropriately rehabilitative within the context of the Juvenile Justice Act, even if the juvenile has not been adjudicated a 'serious juvenile offender.' For the following reasons, however, we conclude that those criteria were not met in this case.

"During oral argument, R.E.C. and amicus A.W. explained that upon commitment to DYS every juvenile is assigned an 'individual service plan' (the 'Plan'). The Plan is based on a study and evaluation of 'all pertinent circumstances of [the juvenile's] behavior and life.' Section 44-1-30[, Ala. Code 1975]. A.W. contends that a determinate commitment would involve no statutory difficulty if the commitment is based on specific findings of fact and orders that are intended to, and that do, become integrated into the Plan itself. As he phrases it: 'That statement of determination of time [would] then become[] part of the child's ... Plan.' Similarly, amicus DYS orally argued: 'It could help DYS for the juvenile judge to share in the responsibility to determine the method and length of treatment that the child should have.'

"We agree with these propositions. Indeed, as a logical matter, few, if any, of the 'circumstances of [the juvenile's] behavior' are more 'pertinent' to the formulation of the Plan

---

[7]See § 12-15-117(a), Ala. Code 1975 ("Once a child has been adjudicated delinquent, ... jurisdiction of the juvenile court shall terminate when the child becomes 21 years of age unless, prior thereto, the judge of the juvenile court terminates its jurisdiction by explicitly stating in a written order that it is terminating jurisdiction over the case involving the child.").

16

than the circumstances out of which the delinquency adjudication arose. Few, if any, of the state officials responsible for the juvenile's rehabilitation are better situated to make findings of fact regarding those circumstances than the juvenile court judge. We conclude, therefore, that an order of commitment for a definite period does not offend the Act, even though the juvenile has not been adjudicated a serious juvenile offender, provided that the order is accompanied by specific findings of fact and a reasoned analysis as to how the determinate period is calculated to benefit the juvenile or to further his or her rehabilitation; and provided, further, that the court's intent to incorporate its order into the Plan plainly appears in the order."

678 So. 2d at 1043-45.

We see no reason not to apply Ex parte R.E.C. to serious juvenile offenders. Whether a juvenile court finds a juvenile to be a serious offender or not, the purposes of the Juvenile Justice Act and the duty of DYS and juvenile courts to work in concert and coordination to achieve those purposes are the same. Of import, we think, is the fact that the Court in Ex parte R.E.C. placed no limit on the length of the determinate commitment that a juvenile court may order for a nonserious juvenile offender. In B.W. v. State, 834 So. 2d 816 (Ala. Crim. App. 2001), this Court noted that an order committing a nonserious juvenile offender to the custody of DYS until his 21st birthday complied with the

17

requirements in Ex parte R.E.C.[8] As the State points out, if a nonserious juvenile offender can receive such a commitment, it would be absurd to hold that a serious juvenile offender could not. Therefore, we agree with the State that Ex parte R.E.C. should apply to serious juvenile offenders.

Having determined that Ex parte R.E.C. applies here, we conclude that the juvenile court's order does not comply with the requirements in Ex parte R.E.C. The juvenile court did make extensive findings of fact regarding the crimes as required by Ex parte R.E.C., but it did not provide a reasoned analysis as to how committing K.A. to DYS until his 21st birthday was calculated to benefit K.A. or to further his rehabilitation; nor does the court's intent to incorporate its order into DYS's individual service plan for K.A. plainly appear in the order. After setting out its findings of fact regarding the crimes, the juvenile court stated in its order:

> "For purposes of Disposition, it is hereby ORDERED, ADJUDGED and DECREED:
>
> "1.  That the Juvenile is hereby adjudicated a Serious Juvenile Offender (SJO) and shall be committed to the

---

[8]The juvenile in B.W. had been adjudicated delinquent on the underlying charge of murder. Although the juvenile court could have found the juvenile to be a serious juvenile offender, see § 12-15-219(a), Ala. Code 1975, it did not do so.

18

Alabama Department of Youth Services until he reaches the age of 21 years old and shall not be released before that time for any reason.

"2. That the Juvenile and his mother [are] ordered to pay restitution to the victims and the State shall have 30 days to file a restitution affidavit for consideration by the Court after a hearing on the same unless the amount of restitution is stipulated to by the parties in writing.

"3. Court costs in this matter are hereby assessed against the Juvenile and his mother, [E.A.]

"4. That the Juvenile is hereby informed of his right to appeal this decision within 14 days and should he be unable to afford an attorney, one shall be appointed for him for the purposes of appeal.

"5. That custody of the Juvenile is removed from the mother and placed with the Alabama Department of Youth Services (DYS) until he reaches the age of 21 years old.

"6. That DYS is authorized to exercise the powers listed in Section 44-1-33, Code of Alabama, 1975, as amended.

"7. That DYS is authorized to place the Juvenile in greater or lesser restrictive environment according to its rehabilitation program.

"8. That DYS is authorized and directed to obtain such physical testing and to obtain the results thereof as it deems necessary.

"9. That DYS is authorized and directed to implement procedures of identifying, evaluating and determining the eligibility of students in need of special education and related services as specified in Administrative Code Chapter 290-080-090, Special Programs.

"10. That pending transfer to DYS, the Juvenile is directed to remain detained in the Lee County Youth Detention Center until transported to DYS for placement.

"11. That the mother, [E.A.,] is hereby made a party to these proceedings."

(C. 63-64.)

The juvenile court's order is similar to the orders in T.D.B. v. State, 195 So. 3d 314 (Ala. Crim. App. 2015), Q.S. v. State, 188 So. 3d 710 (Ala. Crim. App. 2015), and T.L.S. v. State, 153 So. 3d 829 (Ala. Crim. App. 2013), all of which this Court found did not comply with the requirements in Ex parte R.E.C. Therefore, in accordance with Ex parte R.E.C. and its progeny, we remand this case for the juvenile court to set aside its order of commitment and to resentence K.A. and issue a commitment order that complies with Ex parte R.E.C. Due return shall be filed within 56 days of the date of this opinion.

REMANDED WITH INSTRUCTIONS.

Windom, P.J., and Cole, Minor, and Anderson, JJ., concur.